268 So.2d 859

Johnnie **ROGERS**

**v.**

**STATE.**

**1 Div. 319.**

Court of Criminal Appeals of Alabama.

Oct. 31, 1972.

**80**

David L. Barnett, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

TYSON, Judge.

Johnnie Rogers was indicted for the murder of one Governor Foster Hall by stabbing him with a knife, and was convicted of murder in the second degree. The jury's verdict and judgment fixed punishment at life imprisonment.

The homicide in question occurred on the night of May 9, 1971, at the home of one William Woodward in Mobile, Alabama. Woodward testified that the appellant lived next door to him, and, along with about twenty or twenty-five other persons, was invited to his home on that occasion to celebrate his wife's birthday.

Woodward stated that Rogers came to his house that afternoon about 1:30, left about twenty minutes later, and returned with Governor Hall, the deceased, around 4:00 p. m. He testified that everyone there that night was drinking, including appellant and the deceased, but that in his opinion neither of them was drunk.

At one point during the evening, at about 7:00 p. m., Woodward overheard appellant arguing with one Willie Earl, another guest at the party. Woodward believed the argument to be over a drink. Appellant was asked to leave the party by Willie Mae Ford, Woodward's common law wife, and, later, according to Woodward, "Willie Mae asked me to put Johnnie out." Appellant left the party for a short while, then came back and began arguing with Willie Earl again. Governor Hall was apparently not involved, at this time, in the argument.

Woodward testified that as appellant was leaving the party for the second time, he told Governor Hall that he wanted to talk with him outside. Woodward stated that he followed appellant and Hall as they went outside, and, according to Woodward, when the three of them got outside, appel-

lant grabbed Hall around his arms and said, "Talk to me." Woodward stated that he then told appellant to release Hall, to which appellant responded, "I feel him getting a knife." At that point, appellant turned Hall around, hit him, and Hall fell to the ground, hitting his head on the house as he fell.

Woodward then grabbed the appellant, pulling him away from Hall, and in the process noticed that the appellant was cut on the right arm. At some point during the fracas, Woodward stated that the appellant stabbed him in the knee, at which point he released the appellant.

It was Woodward's testimony that appellant then straddled the deceased, who was lying on the ground, and stabbed him twice in the chest. At that point, Woodward went next door and called the police.

Woodward further stated that he never saw Governor Hall cut the appellant, nor did he ever see the deceased with a knife in his hand.

After calling the police, Woodward returned to his house and saw the appellant standing in his own yard, separated from his yard by a fence. He heard someone say, "Johnnie you're going to kill him, you're going to kill the Governor." Woodward saw appellant jump over the fence separating the two yards and heard him say, "If I haven't, I'm going to kill him." As the appellant was jumping the fence his wife grabbed his leg, causing him to fall and apparently injure his leg. He heard appellant say he was going to cut Hall's nose off, then saw appellant stab the deceased several more times.

Willie Mae Ford testified that she was present at the house when the killing occurred; that at one time during the evening she asked appellant to go home; that he did in fact leave, but came back several minutes later; that she then told her husband to have a talk with the appellant. She heard appellant tell Governor Hall that he wanted to talk with him, and the

two of them, together with her husband, went outside.

When she next looked outside, she saw the appellant on top of Hall, cutting him, and saying, "I'm going to kill him."

State's witness Samuel Huff was also present at the party on the night of the homicide, but did not witness the entire incident. He testified that he saw appellant jump over the fence and say, "This son-of-a-bitch ain't dead." According to Huff, the appellant "tried to cut his (deceased's) nose off and he couldn't so he started working on his throat." At that time Huff went back into the house.

One Robert Ford was also present at the party and witnessed the killing. He saw appellant and Hall outside, and appellant was telling Hall, "Listen to me, you're going to talk to me." He further stated that he saw appellant push Hall back and say, "You're not going to get to your knife"; that Hall had his hand in his pocket, and when Hall pulled his hand out of his pocket, appellant swung him around, staggering Hall. According to Ford, Hall hit appellant on the arm with his knife, and his (Hall's) momentum carried him to the wall of the house where he struck his head and was knocked unconscious.

Ford went into the house to tell his sister, and when he came back out, "Johnnie was sitting on Hall stabbing him." He saw appellant stab deceased approximately three times. Ford then went back into the house. He returned in a moment and saw the appellant standing on the other side of the fence in his own yard. He heard appellant say, "I've got to kill him." He then saw appellant leap the fence, and according to Ford, "He sit astraddle of him with the knife and put it on his nose and cut his nose and when he did that I walked away and went back into the house . . . I couldn't take no more."

Johnnie Rogers took the stand in his own behalf. He testified that on the date in question he first went to the home of

Willie Mae Ford around 9:30 a. m., at which time he assisted Governor Hall in building a fire in the barbeque pit in preparation for the party that night. Thereafter, he and Hall, and one Jeremiah Huff, purchased three beers from Willie Mae Ford and drove to Jeremiah Huff's sister's house. While there, he and Huff played cards until about 11:00 or 11:30, during which time he stated that he drank about half a quart of gin.

Appellant testified that he arrived at the party by himself around 12:30 or 1:00; that Hall was already there when he arrived. He further stated that he began drinking beer when he arrived at the party, and during the evening consumed a large quantity of alcohol, including gin, whiskey, and beer.

Appellant testified that at one point in the evening he asked one Mary Moore, an aunt of Willie Earl, if he could get her anything. Willie Earl apparently resented this remark to his aunt, and an argument ensued. Willie Mae Ford intervened and asked appellant to leave the party.

Appellant left the party but returned shortly thereafter to get his cigarettes which he had left behind. He stated that Willie Mae let him in, gave him a drink, and they proceeded to the den. In the den he was met by Willie Mae's husband, William Woodward, who told him to leave. Appellant said he told Woodward that he wanted to talk to him, and they walked outside for that purpose. According to appellant, Hall went outside with them and the next thing he knew, "William was shaking my arm and Governor was cutting me in the arm laughing like that." A scuffle ensued during which Hall was thrown against the fence.

According to the appellant, "I blanked out but I know I had a hold of him and when my sight came back I was shaking him toward my chest and that made the knife stab him in the chest and it cut him."

Appellant stated that he had no recollection of having intentionally stabbed the deceased.

## I

In the prosecuting attorney's opening remarks, we find the following:

"MR. GRADDICK: After we finish our opening remarks to you then the State has the burden to place on that witness stand the testimony which you will be concerned with primarily in determining the guilt or innocence of Johnnie Rogers. This is sworn testimony and as Judge Hodnette has told you, you are to listen to this testimony and determine—

"MR. SEALE: If the Court please we object to his statements other than statements of what he intends to prove.

"THE COURT: Well, I don't think that it has done any damage but Mr. Graddick I'll ask you to confine your remarks to what you expect the evidence to show by the State's witnesses.

\*     \*     \*     \*     \*     \*

"MR. GRADDICK: And Willie Mae told her sister that she had asked Johnnie Rogers out one time.

"MR. .SEALE: I object to what somebody stated outside the presence of the Defendant.

"THE COURT: Well it wouldn't be admissible except in some circumstances Mr. Graddick.

"MR. GRADDICK: Yes but I expect the evidence to show that this lady told about it.

"THE COURT: All right. Overruled.

"MR. SEALE: We want to object to his statement in his oral statement of what he expects to prove that Willie May told her husband something. It is not being shown to have been made in the presence and hearing of the Defendant.

"THE COURT: Overruled.

"MR. SEALE: Except.

\* \* \* \* \* \*

"MR. GRADDICK: Now basically that's what the State expects to show you. The Judge will charge you at the end of the trial that we have to prove that beyond a reasonable doubt and after you hear the evidence that comes from that witness stand I'm sure that you—

"MR. SEALE: We object to his arguing the case to the jury, saying after you hear—

"THE COURT: Overruled.

"MR. SEALE: Except."

■ The law in Alabama is well settled that counsel is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show. Pope v. State, 174 Ala. 63, 57 So. 245; Patterson v. State, 34 Ala. App. 359, 39 So.2d 709; Daniels v. State, 243 Ala. 675, 11 So.2d 756, cert. den. 319 U.S. 755, 63 S.Ct. 1168, 87 L.Ed. 1708; Forrest v. State, 257 Ala. 97, 57 So.2d 385.

■ The statement here that "Willie Mae told her sister that she had asked Johnnie Rogers out one time," was in the nature of what the State expected to show. The proposed evidence was not *per se* illegal, but rather could have been admissible under the proper circumstances. The State went on to prove that Willie Mae Ford did in fact ask the appellant to leave the party shortly before this incident occurred, although it was not shown that she informed her sister that she had made this remark. However, it is no cause for reversal that the prosecutor fails to prove a particular thing proposed in his opening argument, so long as his proposals were made in good faith. Handley v. State, 214 Ala. 172, 106 So. 692. Here, there is no allegation or showing that the prosecutor was acting in any other manner.

We find none of the prosecuting attorney's statements either improper or prejudicial to the rights of the appellant.

## II

The appellant next contends that the trial court erred in allowing testimony as to statements allegedly made by him to police officers at the scene of the crime prior to being advised of his rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694.

During direct examination of Police Officer Phillip Tipp, who investigated the homicide, the following occurred:

"Q When you arrived on the scene had any other police officers arrived?

"A Yes sir, Officer Robinson had got there just a half a minute or so before I did. I saw him pull up.

"Q All right. And when you pulled up there what did you do?

"A Well there was a large crowd of people at first. I got through the crowd and observed the body laying over next to the house. I observed the man with the knife in his hand. Officer Robinson asked the man to give him the knife. He did. Robinson turned around and handed me the knife.

"Q Did you hear the man with the knife make any statement at that time?

"A Yes I did.

"Q What did he say?

"MR. SEALE: I object to that.

"A No questions had been asked as yet.

"THE COURT: Had anyone asked him questions?

"A No sir.

"THE COURT: Overruled.

"MR. SEALE: Well the officers had come to investigate.

"THE COURT: I take it you mean statements that were made and not in response to any question asked and before he began to be interrogated?

"MR. GRADDICK: I can lay a predicate for this now.

"THE COURT: Well then go ahead.

"Q Was the man under arrest?

"A At that moment?

"Q Yes.

"A When the knife was handed to me?

"Q Yes.

"A No he wasn't.

"Q Had any questions been asked of him?

"A No.

"Q And did you have any idea whether he was a suspect or not?

"A No, not at that time.

"Q Did he make any statement to you?

"A He was talking freely.

"Q What did he say?

"A He said he killed the SOB.

"Q That he killed him.

"Q Yes sir.

"Q Did he say anything else?

"A He just kept saying he killed him and he'd kill him again and again if he had to.

"Q He said he'd kill him again if he had to.

"A Yes.

"Q Now what did you do at that time?

"A At the time?

"Q Yes.

"A At that time we took the subject and placed him in the rear of my scout car.

"Q Did you advise the subject of his rights?

"A Officer Robinson advised him of his rights at that time—

"MR. SEALE: I object to that.

"THE COURT: All right. Excuse the jury."

Examination of Police Officer Jessie Robinson, who also investigated the homicide, revealed the following:

"Q Did you have an opportunity to investigate the scene out on Jones Avenue on May 9, 1971?

"A I did.

"Q When you got to the scene what if anything did you see?

"A I seen a man laying on the sidewalk cut all to pieces.

"Q And did you have an opportunity to notice whether anyone was standing around with any sort of weapon?

"A Not at the present time I didn't. There was so many people around.

"Q When did you notice this if you did sir?

"A I noticed this man here with a knife and he handed it to my partner and my partner handed it to me.

"Q I show you State's Exhibit 11 and ask you if that's the same knife you had in your possession that night?

"A It is.

"Q And do you know who delivered this knife to anyone if he did hand it to anyone?

"A He handed it to James Waldrop and said this is the knife.

"Q To James Waldrop?

"A Yes. He was a new officer. He'd been on about two weeks.

"Q Did you have an opportunity at the scene—what did you say if anything to the Defendant here?

"A He walked up and said he did it and handed the officer the knife. I took him by the arm and placed him in the scout car.

"Q Was Officer Tipp there?

"A I handed Officer Tipp his knife.

"Q Waldrop handed it to you?

"A Yes sir.

"Q And you say you placed him in the scout car. What if anything occurred in the scout car?

"A I advised him of his rights.

"MR. SEALE: We, of course, move to exclude.

"THE COURT: I'm going to grant that motion to exclude. I'm going to exclude the jury.

"MR. SEALE: Judge, don't excuse the jury.

"Q Did he make any statements to you at that time?

"A He said that he had killed a man and I said don't say anything. I said you have the right to remain silent. I advised him not to say anything and I continued with the rights.

"Q What else did he say to you?

"A After I advised him of his rights we started to the hospital and he kept saying that he killed a man and that was all there was to it, he killed him. He said I know my rights and I killed him. That's it.

"Q When he got to the hospital was he cooperative?

"A He was very loud in the emergency room, kept stating the fact that he had killed a man and that he knew this judo stuff and that he'd do it again if he had to.

"A Yes.

"Q Did he ever threaten you?

"A He told us he's whup all us if he had to."

The fact that appellant was not represented by counsel when he allegedly made these incriminating statements does not, in itself, render the statements inadmissible. Beecher v. State, 280 Ala. 283, 193 So.2d 505. None of the statements alleged to have been made by the appellant were made in answer to questioning by anyone, but rather were spontaneous and of a purely voluntary nature. Bedingfield v. State, 47 Ala.App. 677, 260 So.2d 408.

We find the applicable rule under these circumstances aptly stated in In re Orr, 38 Ill.2d 417, 231 N.E.2d 424, as follows:

". . . It is therefore apparent that the issue here is not the necessity of a warning prior to questioning, but its necessity before a spontaneous declaration may be received in evidence. Although we have not heretofore considered this question, our research discloses several cases in which other courts have done so. All agree that *Miranda* does not require police to interrupt a suspect in the process of making a spontaneous statement in order to warn him of his constitutional rights, and that a statement made in the absence of any questioning is not inadmissible by virtue of the failure to give such warning. Ballay v. People, [160 Colo. 309] 419 P.2d 446, 449; United States v. Cruz, (W.D.Tex.) 265 F.Supp. 15, 20; Diaz v. United States, (E.D.La.) 264 F.Supp. 937, 945; People v. Jones, 244 Cal.App.2d 378, 52 Cal. Rptr. 924, 926; see also State v. Hymore, 9 Ohio St.2d 122, 224 N.E.2d 126, 129.) In our opinion, these decisions are correct. In *Miranda*, the majority makes clear that its requirement is directed solely toward warnings prior to in-custody interrogation, for, during the course of the opinion, it said (384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726): 'In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissi-

ble. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . ."

 Applying this rule, we hold that the statements volunteered by appellant at the scene of the crime were properly admitted as spontaneous exclamations. Guenther v. State, 282 Ala. 620, 213 So.2d 679; Willis v. State, 44 Ala.App. 616, 217 So.2d 828.

While appellant was technically "in-custody" for *Miranda* purposes when placed in the patrol car after having already made incriminating statements, any statements made in the patrol car in the officers' presence were also properly admitted as spontaneous exclamations, as the record clearly reflects that appellant was talking freely and had not been asked any questions prior to his making such statements. Guenther v. State, supra.

### III

The appellant contends that the trial court erred in refusing to allow him to state whether he was drunk or sober at the time the homicide occurred. We feel that such ruling resulted in no prejudice to the appellant for two reasons.

First, the appellant himself testified that he drank half a quart of gin, several beers, and a large amount of whiskey on the date of the homicide. Thus, there was ample evidence before the jury as to the quantity of alcohol which appellant consumed on the date in question to enable the jury to reach a determination as to his sobriety. Also, such would be a self-serving conclusion.

 Second, voluntary intoxication never provides a defense for homicide, Conwill v. State, 8 Ala.App. 82, 62 So. 1006, but may, under extreme circumstances, ne-

gate the specific intent required to be found in first degree murder. Gilmer v. State, 181 Ala. 23, 61 So. 377; Waldrop v. State, 185 Ala. 20, 64 So. 80.

 However, as to second degree murder, the crime for which appellant stands convicted, the law in Alabama is such that a finding of specific intent to kill is unnecessary to support a conviction. Smith v. State, 154 Ala. 31, 45 So. 626; Titus v. State, 117 Ala. 16, 23 So. 77; Fowler v. State, 155 Ala. 21, 45 So. 913. Thus, the fact that appellant was drunk at the time of the homicide would not excuse his act.

We have carefully examined the entire record, in accordance with Title 15, Section 389, Code of Alabama 1940, Recompiled 1958, and find no error therein. The judgment of conviction is therefore due to be and the same is hereby

Affirmed.

ALMON, HARRIS and DeCARLO, JJ., concur.

CATES, P. J., concurs in the result.