321 So.2d 267

**Aaron HARRIS, Jr.**

v.

**STATE.**

**6 Div. 788.**

Court of Criminal Appeals of Alabama.

Oct. 21, 1975.

**302**

Richard D. Shinbaum, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Quentin Q. Brown, Jr., Asst. Atty. Gen., for the State.

TYSON, Judge.

Appellant, Aaron Harris, Jr., was indicted for the first degree murder of Alexander White by stabbing him with a knife. The jury found the appellant guilty of murder in the second degree and fixed punishment at forty years imprisonment. The trial court then entered its judgment, setting sentence in accordance with this verdict.

Ellen White testified that she lived at 1000 Twenty-Third Place North in the City of Birmingham and was the mother of one Alexander White. She testified that she last saw her son alive during the week after the week of July 4, 1972, that she did not see her son alive after July 16, 1972, that he was forty-one years of age, and resided in Jefferson County at the time of his death.

Larry Smith testified that he lived at 410 Goldwire Circle in the City of Birmingham, and was employed at Arco Welding Company. He stated that on July 16, 1972, he had gone to the home of one Gladys Clemmons, who resided in the Kingston section of the City of Birmingham, shortly after noontime on July 16, 1972. He stated that one Dorothy Faye Reynolds, the daughter of Gladys Clemmons, was present, along with Johnny Fairley and the deceased, Alexander White, and that the parties were drinking and dancing. He stated that the appellant, Aaron Harris, Jr., came over the early part of the afternoon and joined them. He stated that late that afternoon he heard Dorothy Faye Reynolds yelling and screaming, that he ran into the kitchen part of the house and saw the appellant leaving the house with a butcher knife in his hand. He stated that the deceased, Alexander White, was bleeding from his right side and back, that he helped Dorothy Faye Reynolds ease the deceased to the

floor where they attempted to put some towels on him, and called an ambulance. He stated that he saw the appellant later that evening at the Quick-Mart about 9:30, and that the appellant had left the home of Gladys Clemmons about 4:30 that afternoon after the incident.

Charles C. Robey testified that he was an employee of the Jefferson County Coroner's Office on July 16, 1972. He testified that he saw the body of the deceased, Alexander White, in the autopsy room at University Hospital in Birmingham. He testified that he observed multiple stab wounds on the front and the back of the body, that Dr. Thomas A. Gaston was in attendance at the University Hospital, and had signed the death certificate, which showed death to have been caused by "cardiac arrest due to shock due to stab wound of thoratic aorta." He testified that this was one of the main vessels leading from the heart to the middle of the body.

Johnny Fairley testified that on July 16, 1972, he was at 1880 North Forty-fourth Place in the City of Birmingham, the home of Gladys Clemmons. He testified that he went over there shortly after 12:00 midday, that three of the daughters of Gladys Clemmons were present, along with Alexander White, Aaron Harris, Jr., and himself. He described the interior design of the home. He testified that he last remembered seeing Alexander White in the living room talking with Aaron Harris, Jr., the appellant; that later he heard Dorothy Faye Reynolds cry out, that he then went into the room, that he saw the appellant leaving, and saw Dorothy Reynolds attempting to put towels on the person of the deceased, Alexander White. He testified that he saw a knife in the hand of the appellant, and that all of the parties had been drinking that afternoon.

Dorothy Archibald testified that she was also known as Dorothy Faye Reynolds and was the daughter of Gladys Clemmons. She stated that she was divorced and that she was at the home of her mother on July 16, 1972, when Larry Smith, and Johnny Fairley came over, along with Alexander White. She testified that a little later in the afternoon Aaron Harris, Jr., also came over, that the parties were all playing records and having some drinks. She testified that she saw Alexander White come out of the kitchen and then go back, that he was engaged in conversation with Aaron Harris, Jr. From the record:

"Q This conversation between Aaron and Alexander, how long did this conversation go on?

"A About two or three words past. Aaron kept reaching over Alec and accidentally hitting or tipping him with his arm, you know. So he said 'Man, why don't you stop reaching over me?' and he started mumbling something.

"Q Now who started mumbling something?

"A Aaron.

"Q Could you hear any of these words that you say he mumbled?

"A I couldn't understand what he was mumbling.

"Q All right. Go ahead.

"A My mother told Aaron to go in the front room and leave Alec alone.

"Q Then what happened?

"A He mumbled something else. And he walked in the living room. He turned around and he went back in the kitchen.

"Q When you say he, who are you referring to?

"A Aaron. He walked back in the kitchen.

"Q Then what happened?

"A Alec was fixing to get up and come into the living room and Aaron was saying something to him, so my mother told Aaron to leave Alec alone and Alec said, 'Man, why don't you leave me alone, I'm not bothering you.' So Alec started to

walk to the living room and Aaron was standing up. And just as Alec was walking to the living room Aaron backed to the kitchen sink and reached and got a knife and started stabbing at Alec.

"Q When you say he started stabbing at Alec, did you ever see him stab Alec?

"A Yes I did.

"Q Where was Alec when Aaron started stabbing him?

"A He was standing by the refrigerator.

"Q Is the refrigerator in the kitchen?

"A Yes.

"Q Where, in the kitchen, is the refrigerator?

"A It's by the entrance to the kitchen.

.    .    .    .    .    .

"Q What did Alec do while Aaron was stabbing him?

"A He was trying to run.

"Q Which way was he going?

"A Toward the front door.

"Q Coming down this way (indicating diagram)?

"A Yes.

"Q Did he ever get into the living room?

"A Yes.

"Q What happened after he got to the living room?

"A Just as he got to the living room Aaron caught him and he stabbed him in the back with the knife and I guess as he felt it he turned around and threw up his hands and Aaron kept on stabbing at him and Alec was backing up and Aaron kept on coming toward him, stabbing him. And he fell between the chair and the table in the living room. And when he fell Aaron just stood over him and was stabbing down at him."

She testified that she screamed, "Leave him alone," at the appellant, that she saw the appellant turn and run toward the front door, that she and one of the men eased Alexander White to the floor and began putting towels on his body. She testified that Alexander White did not have a knife or any other type of weapon, nor did she see him attempt to stab or hurt anyone. She testified that the appellant stabbed Alexander White with a long butcher knife.

The appellant's motion to exclude the State's evidence was overruled.

Della Harris testified that she was the mother of Aaron Harris, Jr., and lived at 809 B Forty-fourth Place North in Birmingham. She testified that she remembered an incident on July 16, 1972, that her son had been at her home, and that he used to date a daughter of Gladys Clemmons by the name of Gerry. She testified that her home was directly across the street from the Clemmons home. She testified that she was cooking some barbeque and she saw her son leave to go over to the Clemmons' home. From the record:

"Q How did you first learn that any trouble had occurred over there at Gladys Clemmons' house on this afternoon?

"A I was sitting on the back and the lady next door she run around and said Della go over there and see what's happening over there. They're in a fuss over there.

"Q So did you go over?

"A Yes sir. I come to the door to go over there and when I come to the door to go over there Eddie was coming to the door. He was wrapped up in blood. And he pushed out the door and he fell down right in the front door. And Aaron was coming up in my yard. And my son hit him and knocked the knife out of his hand and I grabbed the knife. He come walking fast behind me and I grabbed the knife and run and chunked it in my back yard. And I run on over there to Miss Gladys' and I didn't get no

further than her porch. And Alex was still laying down there. And I looked into the house. I didn't go in the house. I went on the last step and I seen Dorothy and Gerry. And I seen her son-in-law and another man. I didn't know him. And Aaron was hit in the eye and cut on the arm and scarred all up.

"Q   Are you saying Eddie was lying on the porch or Alex was lying on the porch?

"A   Eddie was lying on the porch.

"THE COURT: Who is Eddie?

"MR. CORNELIUS: That's what I'm trying to straighten out Your Honor.

"Q   Are you talking about Alexander White?

"A   I didn't know him.

"Q   The one you called Eddie is Alexander White, he was lying there on the porch?

"A   Yes sir.

"Q   You say that Aaron came toward your house toward you?

"A   Yes sir.  He was over there in the yard just that quick.  I come to the door. He had already got over there and had the knife in his hand."

James A. Harris, Jr., testified that he was a practicing attorney in the City of Birmingham. He testified that on July 17, 1972, he went to the Jefferson County Jail and there made some photographs of the appellant. He testified that there was a cut above the left elbow on the left arm of the appellant, and identified a photograph which depicted this.

Aaron Harris, Jr., testified that he was thirty-one years of age and had been at the home of his mother on July 16, 1972. He testified that Gerry Murray, one of the daughters of Gladys Clemmons, called him and asked him to come over about 1:30 that afternoon to the party. He testified that Roberta Clemmons and Alexander White were there, along with Dorothy Faye Reynolds and a guy named Johnny Fairley or Farris. He stated that all of them were there dancing and drinking that afternoon. He testified that they were in a discussion in the living room over some records. From the record:

"Q   You mentioned a table on the left hand side. Are you talking about this table that has been drawn in on this diagram (indicating diagram)?

"A   I was sitting right along in there. I was sitting over there by that table there.  Over in the living room.  I was listening to records.  And some record come up and they were talking about, you know, if they were in New York, you know, what they could do.  And I brought up the conversation I said neither one of you ever been in New York, we never be nothing but tramps all our lives no way.  Alec he got up like he was gonna go upstairs up some steps. They had a conversation for about a minute.  You know a little conversation I'd say about a minute.  And Fairley came back and he set over on the left hand side.  Alec came back and he had a knife in his hand and I was trying to pull the sling up.  Gonna keep the sling up high.  And Alec he hit me up over the eye with the back of the knife and I got up and tried to ran.  He was trying to cut at me.  And I seen a knife in the kitchen over by the table and I grabbed it and turned around and started sticking him.

"Q   Where were you when you testified that Alec hit you?

"A   I was along about in there by that table there.

"Q   Were you standing up or sitting down?

"A   Sitting down.

"Q   You say he struck you with the knife?

"A   He struck me first up over the head.  He hit me with the back of the knife.

"Q With the back of the knife?

"A Yes sir.

"Q Did he, at that time, I will ask you whether or not he cut you with the knife?

"A He didn't cut me then after he hit me. I asked him what he was trying to do. Then when he hit ·at me with the knife he cut my arm and I got up and I started running through the kitchen. I seen a knife over there by the sink on the cabinet and I got the knife and I turned around and started stabbing.

"Q Had he cut you on the arm before you got into the kitchen?

"MR. GARRETT: I object to that Your Honor.

"THE COURT: Overruled. Go ahead.

"Q What?

"A He hadn't cut me before I left out of the living room going into the kitchen.

"Q He struck you on the eye with the butt of the knife and cut you there before you left the living room?

"A Yes sir.

"Q You say when you got into the kitchen you found a knife there?

"A I seen the knife."

He testified that after the cutting incident he left the Clemmons home, went back across the street to his mother's home, and that the deceased had struck him over the eye with a knife before he seized the butcher knife, which was used in the stabbing. He said that one of the neighbors asked him to give him the knife, which he did, and that the next day he was arrested and taken to the County Jail.

I

The appellant contends that the State failed to prove a prima facie case of second degree murder.

Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation. *Smith v. State,* 47 Ala.App. 513, 257 So.2d 372; *Young v. State,* 47 Ala. App. 674, 260 So.2d 406; *Miller v. State,* 38 Ala.App. 593, 90 So.2d 166; *Warren v. State,* 34 Ala.App. 447, 41 So.2d 201.

In *Miller,* supra, we find:

" 'Legal Malice' as an ingredient of murder is an intent to take human life without legal excuse, justification or mitigation, and it may be presumed from the use of a deadly weapon, unless the evidence which proves the killing rebuts the presumption. *Coates v. State,* 1 Ala. App. 35, 56 So. 6; *Warren v. State,* supra."

Here, the appellant's use of the knife presented, under the facts outlined, sufficient evidence from which the jury could infer that he acted with malice.

The conflict in the evidence presented a question for the jury to determine, and the evidence was sufficient, if believed by the jury, under the required rule to support the verdict. *Miller v. State,* 38 Ala.App. 593, 90 So.2d 166; *Rogers v. State,* 49 Ala.App. 78, 268 So.2d 859; *Carmichael v. State,* 52 Ala.App. 25, 288 So.2d 807; *Williams v. State,* 51 Ala. App. 694, 288 So.2d 753.

As to second degree murder, the crime for which the appellant stands convicted, the law in Alabama is that a finding of specific intent to kill is unnecessary to support a conviction. *Smith v. State,* 154 Ala. 31, 45 So. 626; *Rogers v. State,* 49 Ala.App. 78, 268 So.2d 859, and cases therein cited.

II

We have examined the oral charge and find that the trial judge did charge the jury on the elements of self-defense.

Moreover, at the conclusion of the oral charge to the jury, the appellant's trial attorney announced, "Satisfied."

Where, as here, appellant's counsel made no exception to the oral charge, but to the contrary replied, "Satisfied," and did not ask for any clarifying instructions, no part of the oral charge is here presented for review. *Cox v. State,* 280 Ala. 318, 193 So. 2d 759; *Allison v. State,* 281 Ala. 193, 200 So.2d 653; *Massey v. State,* 49 Ala.App. 341, 272 So.2d 267, cert. denied, 289 Ala. 747, 272 So.2d 270.

As required by law, we have carefully examined this record and find no error therein. The judgment is therefore due to be and the same is hereby

Affirmed.

All the Judges concur.