TYSON, Judge.
Appellant, Carl Ray Walker, was indicted for murder in the first degree, by killing Benjamin Floyd “by shooting him with a pistol.” The jury found the appellant guilty of murder in the second degree and fixed punishment at twelve years imprisonment. The trial judge entered judgment in accordance with this verdict.
Herman Floyd, age twelve, testified he lived at his home on 203 Lindsey Street in Headland, Alabama, on November 16, 1975, with his brothers and sisters. He stated that Benjamin Floyd was his uncle. He stated that on the evening in question he was at home playing with his brothers and sisters when the appellant, Carl Ray Walker, came to their home, walked up on the porch and knocked. He stated that his little brother, whose nickname was “Peanut,” answered the door, and that Walker asked for Benjamin Floyd. He stated that “Peanut” went to tell his uncle that Walker was there to see him. He stated that Walker and his aunt, Future Floyd, lived in the same neighborhood.
On cross-examination he testified that he had two brothers and two sisters, all of whom lived at home with him. He stated that his uncle, Benjamin Floyd, lived with Otis Floyd, his grandfather. He stated that the deceased, Benjamin Floyd, was known as “Short Change.” He testified that Juanita Walker was the wife of Carl Ray Walker and lived just down the street from their home.
On cross-examination he testified that he heard Juanita Walker tell the appellant to “Let the boy alone,” referring to the decedent, and that he heard one shot. He testified that some of the adults went outside, and he next saw his uncle lying at the back door of his aunt’s home,. that an R. C. “Sonny” Hudspeth, his aunt’s husband was there. He testified he saw blood on the pants of his uncle.
Terry Floyd, age sixteen, testified that on November 16, 1975, he was a nephew of Benjamin Floyd. He stated that Herman Floyd was his brother, and that all of them were at their mother’s home that evening when they heard a knock on the door, and he saw his youngest brother, Charles Floyd, nicknamed “Peanut,” go to the door. He stated that the appellant,! Carl Ray Walker, was standing there and asked for Benjamin Floyd. He stated the appellant told “Peanut” to “tell Small Change to come out here a minute.” He stated that the appellant had a knife. He stated that he remained *157 inside with his brothers as they were watching television, and the next thing he heard was Benjamin Floyd saying, “You are wrong, son.” He stated that he heard a shot, and he saw the appellant, Carl Ray Walker, crank up his car and drive away. He said that his uncle had gone over to his aunt’s home, the Hudspeth’s, which was next door, and he saw his uncle lying there, and later saw some Headland police officers drive up.
On cross-examination he testified that his uncle, Benjamin Floyd, had been drinking, that his eyes were red, and his speech was slurred. He stated that his uncle appeared to be “high.”
Charles Floyd testified that he was age seven and lived with his mother, and brothers and sisters at 203 Lindsey Street in Headland, Alabama. He testified he remembered the night when Carl Ray Walker came to their home and knocked on the door and asked where was “Small Change.” He said that this was his uncle’s nickname. He said that he had been watching television with his brothers and he went and called his uncle and told him that Walker wanted to see him. He said that he saw a knife in the hands of Carl Ray Walker, and that he did not see a knife on his uncle. He said that his Uncle Benjamin, “Small Change,” Floyd went outside, that after a few minutes he heard some talking, and then he heard a sound like a shot. '
Juanita Walker testified that she was the wife of the appellant, Carl Ray Walker. She stated that they lived at 200 Lindsey Street in Headland, Alabama, and that the deceased, Benjamin Floyd, was her “boyfriend.” She said that she had been dating “Small Change” for some time. She stated that about 7:30 on the night in question, she saw her husband, Carl Ray Walker, go over and knock on the door of the Floyd home. She saw Benjamin Floyd come out, and as he did, she started putting her clothes on because they were arguing and fussing. She stated both men had knives. She said that she came outside and told her husband, Carl Ray, to “leave Benjamin alone,” and that Carl Ray then threw her down. She stated that as she was getting up, she heard Carl Ray say, “You cut me,” and that Benjamin started running around the house, that Benjamin had a knife, and that her husband was standing right beside the car and Benjamin was at his side. She stated that she saw her husband pull a gun from his pocket and shoot one time, and that she saw Benjamin run over to his sister’s, Future Floyd’s house. She said that Future Floyd’s husband, R. C. Hudspeth, was there also.
On cross-examination Juanita Walker admitted that she thought Benjamin Floyd was the father of one of her children. She stated that her husband had come home that evening between 6:00 and 6:30 o’clock, and asked her to go to a movie, and that she had declined. She stated that he went out as though to go to a movie and came back later, that she then saw him go over and knock on the Floyd’s door. She said that the argument between the two men was over her, and that she heard the deceased, Benjamin, say to her husband, “Carl, you are wrong.” She said that when she went outside she told Carl Ray to leave Benjamin alone. She said she saw that her husband was bleeding across his face and that Benjamin had a knife when her husband shot. She said that her husband had a six-shot revolver, and that he shot low at the deceased, Benjamin Floyd.
R. C. Hudspeth testified that he lived at 201 Lindsey Street, Headland, Alabama, on November 16, 1975. He stated that his wife was known as Future Floyd, and that she had a sister named Betty who lived across the street, and who had several young sons. He stated that on the night of November 16, 1975, Benjamin Floyd came to his house and told him that he was shot. He stated that he got up and called the doctor and began putting on his clothes. He stated that he noticed a cut on his lip, and that he had a wound in his stomach. He stated that Headland Police Officer Larry Snellgrove came and they called an ambulance, that he helped him put Benjamin Floyd in the ambulance. He stated he saw blood on the clothes of Floyd. He *158 stated that as they were putting Benjamin “Short Change” Floyd in the ambulance, he looked but he did not see a knife, that as Floyd had tried to get up that he had staggered. He testified that Floyd was taken to the Dothan General Hospital within thirty to forty-five minutes of coming to his house that night.
Future Floyd testified that she lived at 201 Lindsey Street in Headland, Alabama, on November 16, 1975. She testified that Benjamin Floyd was her brother, and that he came to her house that evening and that she was there with R. C. Hudspeth with whom she lived. She stated that when she got up out of bed that she saw her brother lying on the floor, and that she saw that he had been cut near the lip. She testified that she called the police and asked them to send an ambulance, and gave them the address. She stated that she pulled up her brother’s shirt and saw blood. She stated that several police officers came and put her brother in the ambulance and took him to the Dothan General Hospital.
On cross-examination she admitted that her brother, Benjamin Floyd had been going with Carl Ray Walker’s wife for some time.
Larry Snellgrove testified that he was a police officer with the Headland Police Department on November 16,1975. He stated that he went to 203 Lindsey Street in Headland between 7:45 and 7:50 that evening. He stated that he went to the back door of R. C. Hudspeth’s home and saw Benjamin Floyd lying on the floor just inside the back door. He stated that he noticed that there was a cut on the upper lip, and that he did not move Floyd until other officers arrived, among them Sheriff Welcher and Chief Smith, and that they called an ambulance and took Floyd to the Dothan General Hospital. He stated that later that evening he went with Deputy Johnny Bradley to where Carl Ray Walker was working and that he drove them down to Holland Street and then went into a house and came back and brought them a thirty-two caliber pistol, which he turned over to them.
On cross-examination Snellgrove stated that Floyd was not dead as he checked his pulse, that there was some blood about his lip, and he saw blood on his pants.
Sheriff J. Frank Welcher testified on the evening of November 16, 1975, he went to 201 Lindsey Street in Headland, Alabama. After making an investigation at the Hud--speth’s home, and seeing that Floyd was taken to the hospital, he went down to Holland Street as he had known the appellant, Carl Ray Walker, for some time. He stated that he saw the appellant’s automobile in front of the Douglas store, and that he went in, the appellant came out and said that he had been wanting to talk with him. He stated that the appellant just reached into his automobile and handed him an H & R six-shot thirty-two caliber pistol. He stated that the appellant went with them to police headquarters, and that later that evening, after first giving him a Miranda card warning, and in no way threatening, intimidating, or abusing the appellant, the appellant said, “I must have given you the wrong gun,” and that they then drove over toward Holland Street, that appellant went into a house and came back and said, “This must be the one,” giving them a second thirty-two caliber pistol with the serial number AJ41723. He stated that this second pistol had one spent cartridge in it, and that he turned it over to H. G. Brown at the patrol station, and that the following day it was picked up and delivered to the State Toxicology Office. He stated that at the scene he found a knife on the body of Benjamin Floyd, and that he took this to police headquarters, having first putting it in a manila envelope.
On cross-examination the sheriff stated that one of the thirty-two caliber revolvers had six shots in it, and the other had five cartridges, and one expended shot.
Joe R. Roney testified that he was employed as a member of the Henry County Rescue Squad, and on Sunday, November 16, 1975, drove to 201 Lindsey Street in Headland. He stated that he drove an ambulance and that they put the body of Benjamin Floyd in it and then drove it to the *159 Southeast Alabama General Hospital. He stated that he noticed a cut on his face and blood on his clothes. He stated that Floyd was conscious and mumbling when he took him to the hospital.
Sylvia Smith testified that she was a nurse on duty at the Southeast Alabama General Hospital on the night of Sunday, November 16, 1975. She stated that a man identified as Benjamin Floyd was brought to the emergency room where he was treated by Dr. Peterson. She stated that, “Floyd had an open wound about the mouth, and down on the left lower abdomen.” She stated that Dr. Atkinson did two cut-downs, and that he endeavored to sew up the veins. She stated she was present when Coroner Jack Still arrived, and that the wounds were the same as when Floyd was brought into the hospital. She stated that Floyd had lost a great deal of blood on cross-examination. She stated that the bullet had entered the appellant’s bladder and severed an artery, causing massive internal hemorrhaging. She further stated that Floyd was admitted to the hospital between 8:15 and 8:30 p. m., and was pronounced dead by Dr. Peterson at 9:13 p. m.
Deputy Johnny Bradley of the Henry County Sheriff’s Department stated that on November 16, 1975, he, accompanied by Corporal Larry Snellgrove of the Headland Police Department, went to a home on Holland Street. He stated the appellant, Carl Ray Walker, was with them, and stated that the home in question was his aunt’s. He stated that Walker walked in and came back out and handed him a thirty-two caliber pistol which he in turn delivered to Sheriff Frank Welcher.
On cross-examination he stated that it was an H & R thirty-two caliber pistol.
Jack Still stated he was coroner of Henry County on November 16, 1975. He stated he examined the body identified to him as being Benjamin Floyd at the Southeast Alabama General Hospital shortly after 9:00 o’clock that evening. He stated that the body was taken to the morgue where he performed an autopsy, and that the body was in the same condition as when received from Mrs. Smith, the nurse. He stated that he observed two wounds on the body, one a cut on the lower lip, and the second a bullet wound in the lower left abdomen in the general hip pocket area.
Dr. G. R. McCahan, Jr., testified he was toxicologist with the Enterprise Regional Laboratory of the Alabama Department of Toxicology. He stated that part of his duties was to examine bodies and conduct post-mortem examinations. He examined the body of one Benjamin Floyd and found that death was caused by internal hemorrhaging due to a single gunshot wound to the lower left abdomen. He then identified a photograph of the deceased showing the wound. He testified that he also received a thirty-two caliber H & R revolver with the serial number AJ41723, also a small manila envelope which contained the knife. He turned the envelope over to Criminalist Dale Carter. He also identified a projectile which he removed from the lower left abdomen in the area of the wound. He stated this bullet was turned over to Mr. Dale Carter.
Richard Dale Carter testified he was Criminalist with the Enterprise Laboratory of the Alabama Department of Toxicology. He stated that he had many times performed examinations of firearms and made comparisons to determine whether projectiles matched weapons. He stated that he had received a thirty-two caliber revolver and five live rounds of ammunition with one expended cartridge ease. He received a second envelope which contained a pocketknife. He stated that he test fired the thirty-two caliber pistol, and that the bullet removed from the body of Benjamin Floyd had the same twist as those which he test fired, and that in his opinion the projectile-in question was consistent with being fired from the gun which he test fired. He stated that he found a bullet wound in the pants pocket area on the left side of the pants delivered to him, and that he found there was human blood on the knife. He also stated that he did not find any gunpowder burns on the clothes.
*160 Carl Ray Walker testified that he was twenty-seven years of age and married to Juanita Walker by whom he had five children. He testified that he owned a place known as the Rainbow Inn in Headland, Alabama. He stated that he also worked for a Mr. E. W. Twitchell in Dothan. He testified that prior to November 16, 1975, he had caught Benjamin Floyd on four separate occasions with his wife in the year and a half period prior thereto. He stated that he had caught Benjamin Floyd at his home, and that he had observed him on one occasion jump out a window with his clothes in his hand. He stated on one occasion R. C. Hudspeth had taken him off in an automobile after he saw him run out of his house. He stated on the night in question he drove by and saw Ben Floyd’s automobile, and he saw Floyd get up and go out of the back door and over to his sister’s home. He stated that he was still living with his wife but that they were not getting along too well. He stated earlier that evening he had seen Floyd at a place known as the “Quarter,” and that he was either “high” or drunk. He said that earlier that day he had seen Floyd with R. C. Hudspeth, that they had been talking real loud. He stated that he knew that Floyd carried a pocketknife as he had seen him with it several times previously and had seen him with one about 4:00 o’clock on the afternoon in question. He stated that he went home that evening and asked his wife to go to a movie, and that she said “No,” and that he then left and went by the Zippy Mart and bought some gas. He stated that he then went on back down to his club, and that he had a conversation with several people who came in, among them Bobby Nell Walker and Gale Warren. He also saw Benjamin Floyd, and that he overheard Floyd say that “Juanita said you’d better bring your A_ on over cause Carl Ray has gone to the show.” He said that he saw Ben Floyd leave and that he waited a little while, then he drove on over there. He said that he saw Ben Floyd’s car parked over at Betty’s house. He said that he went over and knocked on the door and that a little boy, known as “Peanut” answered it, and he told “Peanut” to tell Ben that he wanted to talk with him. He said that just prior to this time he had seen Ben leave his own home before going over to where he knocked on the door. He said that when Floyd came out of the house, he told him, “Ben, you know I know what is going on,” and that Ben said, “Yeah.” He stated that he told Ben, “The best thing you can do is get the woman and you all get the hell out of here, and don’t let me catch you down here no more.” He stated that he was referring to Juanita. He said that Ben said, “You know who the hell you are talking to don’t you,” and he said, “Yes,” and that Ben then said, “I’ll go to your G.D. house any time I get ready.” He stated that Donald Lee Walker walked by about this time, and as he did so, Floyd cut him across the face with his knife. He stated that as Floyd swung at him, he swung back and hit Floyd in the mouth with his fist. He stated about this time Juanita came out of the house and called to them, and that she was putting her blouse on. He stated that about this time Ben ran up behind him and said, “I will kill you, you s. o. b.” He stated that Ben had a knife in his hand as he approached him and that he told Ben to stop, and he again a second time told him to stop, and that he then pulled his pistol and fired low. He stated that he did not intend to shoot Ben, but was trying to make him stop as he was coming at him with his drawn pocketknife. He stated that he only shot once, and that he carried a pistol because he usually had a great deal of money with him when he left the club as he was the manager, and that it was not unusual for him to have $800.00 or $900.00 with him. He said that that evening when the sheriff came to talk with him he told the sheriff that he had just fired once and took the sheriff and got the pistol and gave it to him. He said that he had no intention to kill Floyd, and that it was only when Floyd threatened him that he fired.
On cross-examination Walker stated that Ben “Small Change” Floyd often times came to the club. He also stated that he had never been in any trouble before or had never shot someone, but that he had once had a fight with a pool cue with a man.
*161 John Henry Williams testified that he lived in Headland on November 16, 1975. He stated that he had been down by the Rainbow Inn on the afternoon in question and had seen Ben Floyd drinking that afternoon, and that he was in his opinion “high” and was talking loud and boisterous and that you could not help but hear things he was saying, and that Carl Ray was working behind the counter, that he never did see Carl Ray do any drinking.
Bobbie Jenkins testified that she lived at 109 Peachtree Street in Headland on November 16,1975. She stated that she knew Carl Ray Walker and Juanita Walker and also Ben Floyd. She said that Ben Floyd, about 5:30 or 6:00 that afternoon, had been down at the Rainbow Inn, and that he was “high” in her opinion, that she heard Ben talking loud and saying things, and that he told her “Bobbie, you had better come talk to me because I am fixing to go F— her.” She stated that she knew he was talking about Carl Ray’s wife.
Milton Fry testified that he was living in Headland on November 16,1975. He stated that he had seen Benjamin Floyd with Juanita Walker on several occasions, and that he had in fact had seen them on one occasion down at the Rainbow Inn where Carl Ray Walker worked.
Deputy Sheriff Johnny Bradley testified that on November 16, 1975, he had participated in the investigation of the shooting of Benjamin Floyd. He stated that he had seen Carl Ray Walker, the appellant, that night, and that he had talked with him about an hour after the shooting. He said that it was not unusual for Carl Ray Walker to have large amounts of money on his person as he ran the Rainbow Inn. He stated that the shooting in question occurred about 7:53 that evening.
The appellant then presented a number of character witnesses who all then testified that in their opinion the appellant was of good character and peaceful reputation, and that his reputation in the community was good. Three of the character witnesses were police officers from Headland.
At the close of the case the appellant requested the affirmative charge in writing, which was refused, and also filed a motion for new trial which challenges the weight and sufficiency of the evidence, the appellant insisting that he had no intention to kill Floyd, and that the evidence would not sustain a verdict and judgment of murder in the second degree.
I
The appellant contends that the State failed to prove a prima facie case of second degree murder.
In Carmichael v. State, 52 Ala.App. 25, 288 So.2d 807, we find the following:
“Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation. Smith v. State, 47 Ala.App. 513, 257 So.2d 372; Young v. State, 47 Ala.App. 674, 260 So.2d 406; Miller v. State, 38 Ala.App. 593, 90 So.2d 166; Warren v. State, 34 Ala.App. 447, 41 So.2d 201.
“In Miller, supra, we find:
“ ‘ “Legal Malice” as an ingredient of murder is an intent to take human life without legal excuse, justification or mitigation, and it may be presumed from the use of a deadly weapon, unless the evidence which proves the killing rebuts the presumption. Coates v. State, 1 Ala.App. 35, 56 So. 6: Warren v. State, supra.’ “Here, the appellant’s use of the pistol presented sufficient evidence from which the Jury could infer that he acted with malice.
“The fact that the appellant denied having intended to kill the deceased is not a proper criteria.
“In Rogers v. State, 49 Ala.App. 78, 268 So.2d 859, this Court noted:
“ ‘However, as to second degree murder, the crime for which appellant stands convicted, the law in Alabama is such that a finding of specific intent to kill is unnecessary to support a conviction. Smith v. State, 154 Ala. 31, 45 So. 626; Titus v. *162 State, 117 Ala. 16, 23 So. 77; Fowler v. State, 155 Ala. 21, 45 So. 913 .. . .’
“The conflict in the evidence presented a question for the Jury to determine, and the evidence was sufficient, if believed by the Jury, under the required rule to support the verdict. Miller v. State, 38 Ala.App. 593, 90 So.2d 166; Rogers v. State, supra.”
II
At the conclusion of the trial court’s oral charge, the appellant’s attorney announced, “Satisfied.” The trial court then gave some four written requested charges, but refused the affirmative charge, and also requested two charges which had to do with “that the appellant had gone to his house in a peaceful manner for the purpose of adjusting a prior difficulty, i. e., Floyd’s adulterous conduct with his wife.” This charge is faulty, not only in that it is argumentative and invasive of the province of the jury, but such charge does not correctly state the law, and was therefore properly refused. We find that the trial court did properly charge on the elements of self-defense and that the remaining charges were either covered by the trial court’s oral charge, or the given charges, and that the remainder were therefore properly refused. Title 7, Section 273, Code of Alabama 1940.
We have carefully examined this record as required by law and find same to be free from error. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur except CATES, P. J., not sitting.