365 So.2d 985 (1978)
Gilbert Franklin BECK, alias
v.
STATE.
7 Div. 560.
Court of Criminal Appeals of Alabama.
April 4, 1978.
Rehearing Denied May 2, 1978.
*987 James F. Hinton and Donald W. Stewart, Gadsden, for appellant.
William J. Baxley, Atty. Gen. and James F. Hampton, Asst. Atty. Gen., for the State, appellee.
DeCARLO, Judge.
Capital felony; death.
This cause is before this court under the Automatic Appeal Act; Act No. 213, Acts of Alabama, 1975, which mandates that appellant, Gilbert Franklin Beck's death sentence set by the circuit court of Etowah County, be reviewed by this court.
It is an appeal from a conviction of murder under Alabama's new Death Penalty Act, committed during the course of a robbery.
Pursuant to this authority, the judgment of conviction and sentence of death have been given a priority review as has been the practice of this court in considering all death cases.
Gilbert Franklin Beck was indicted by the grand jury of Etowah County on a charge of robbery with aggravating circumstances of intentionally killing the victim. The indictment, omitting the formal parts reads as follows:
"Gilbert Franklin Beck . . . . whose name to the Grand Jury is otherwise unknown than as stated, feloniously took three (3) twenty-dollar bills, lawful United States currency, of the value of $60.00; one (1) ten-dollar bill, lawful United States currency, of the value of $10.00; and three (3) one-dollar bills, lawful United States currency, of the value of $3.00, all of the aggregate value of $73.00, the property of Roy Malone, from his person or in his presence, and against his will, by violence to his person, or by putting him in such fear as unwillingly to part with the same, and during the course of said robbery the said defendant did unlawfully and intentionally, and with malice aforethought, kill Roy Malone, the victim of said robbery, by cutting the said Roy Malone with a knife. . . ."
On November 29, 1977, a motion to quash the indictment was filed along with a petition for a change of venue and a motion to produce. On February 10, 1977, the court granted the defendant's motion to produce and on February 18, 1977, appellant's motion for a mental examination was also granted. An amended motion to quash the indictment was filed on February 25, 1977, and this motion and the petition for a change of venue were both denied.
On February 25, 1977, the court ordered that the appellant be sent to Bryce Hospital for a mental examination and, on that date, defendant filed a demurrer to the indictment. Approximately three months later, June 10, 1977, the defendant filed an additional motion to quash and it, along with the demurrer to the indictment, was overruled.
On that same day an arraignment was held at which time the appellant declined to *988 plead. The court entered a plea on behalf of the accused of not guilty and not guilty by reason of insanity.
Following jury selection, the trial of the case was begun on June 20, 1977.
The evidence produced at trial established that on November 8, 1976, the appellant and one Roy Frank Clements drove to the home of Roy Malone. Malone's home was located in the Shady Grove community in the northern part of Etowah County, near the town of Boaz, Alabama. Mr. Malone was an eighty-year old retired veterinarian and lived in a house with his housekeeper, Dora Mae Ford.
It is uncontroverted that the appellant and Clements went to the Malone home for the specific purpose of robbing Malone. After driving to the Malone home in the appellant's pickup truck, the appellant and Clements engaged Mr. Malone in conversation in his yard. They had gone there on the pretext of making an inquiry concerning some materials for building chicken pens.
The conversation continued for a few minutes when a yellow Chevrolet, occupied by three men, arrived at the house. The men got out of the `car where appellant and Clements were talking to Mr. Malone, and after a short conversation, the appellant and Clements left and returned to Clements' apartment in Boaz. They had left Clements' wife, Debbie, and Mary Ann Thrasher, the woman with whom the appellant had been living for some time, at the apartment.
The appellant and Clements remained at Clements' apartment with the two women until approximately 2:00 P.M., when they again left in the appellant's pickup truck for the Malone residence. Around 2:30 P.M., they arrived at the Malone house the second time. They went inside and found Mr. Malone in the kitchen. Clements, saying that he was going to the bathroom, left the appellant and Mr. Malone alone in the kitchen. Within a short time, Clements returned, and, at a given signal, the appellant grabbed Mr. Malone around the waist and the two wrestled to the floor.
According to the appellant, he and Clements had previously discussed tying Malone up with a rope. The appellant said that while he and Malone were on the floor scuffling he was trying to tie the old man. At that point, appellant testified that Clements came up to Malone and cut him on the right side of his neck. The appellant then stepped over the old man's body, left the house and went to the truck. According to Beck, Clements remained behind in the house approximately three minutes, then came outside carrying a lady's purse and Malone's wallet.
Beck said they subsequently left and returned to Clements' apartment in Boaz, Alabama. When they arrived the women were not there and they could not get into the apartment so they drove to the appellant's trailer and waited there for the two women. Within about fifteen minutes the women arrived and it was then that they determined that some seventy-three dollars was involved in the robbery.
Theron Malone testified that he was the son of the victim and stated that on November 8, 1976, he had gone to his father's house between 4:20 and 4:30 P.M. Theron Malone said that he was alone at the time and that he entered the house though the kitchen where he found his father's body on the floor. During the trial, he identified not only pictures depicting his father's body, but also identified a wallet which he said belonged to his father. Malone added that he had given the wallet to his father as a Christmas present.
Don Longshore, an investigator with the Etowah County Sheriff's Department, stated that he had made an investigation concerning Malone's death. He testified that he had gone to the Malone home at approximately 5:30 P.M. on the day of the homicide. Longshore said that he remained at the residence for about thirty minutes, then left with his partner, Mr. Hatley, Donald Wiggins and two uniformed deputies and drove to the appellant's house trailer.
According to Longshore, on their arrival, he found the appellant and Mary Ann *989 Thrasher in the trailer. He informed Beck that he wanted to talk to him, and at that point, Thrasher said that he needed to talk to Roy Clements also. Further, Longshore recalled that the Thrasher woman indicated that the appellant and Clements had been together all afternoon.
Longshore testified that, the appellant and Thrasher were placed in one of the squad cars and sent to the courthouse. Afterwards the officers went to the apartment of Roy Clements and he, too, was taken into custody.
Longshore went on to say that after receiving written permission to make a search of the trailer, he and the officers returned to the trailer and while there took into custody a pair of men's boots found in a pickup truck parked at the rear of the trailer. The officers also took into custody a barrel with burned clothing in it that was sitting outside the trailer. The boots were taken to police headquarters and the barrel and the pickup truck were removed to Rodgers' Wrecker Service yard.
After appellant had been warned of his rights, he signed a waiver and made a statement. That waiver and statement were accepted into evidence and read as follows:
"WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY
"I, Gilbert Franklin Beck, have been informed by the undersigned law enforcement officers, prior to being questioned by them that I am suspected of the offense of murder 1st Degree in Etowah County, Alabama on the 8th day of Nov. 1976 and have been informed by them of my Rights as follows:
"1. That I may remain silent and do not have to make any statement at all.
"2. That any statement which I might make may be used against me in Court.
"3. That I have the right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.
"4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me to consult with him before making any statement; and to have him present with me while I am making a statement.
"5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.
"After having my rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I fully understand my rights to an attorney and I have readhad read to me this Waiver of Counsel and fully understand it. No threats of promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to officers.
"This the 9th day of Nov. 1976. 10:20 A.M.
 "x Gilbert Beck
"All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived the right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after (having readhad it read).
 "Name Don Longshore
 "Title Etowah Co. Investigator
"Witnessed by:
"Arnold Hatley
"_______________________________________________
"VOLUNTARY STATEMENT
 "(Under Arrest)
DATE 11-9-76 TIME 11:05 A.M. PLACE Etowah Co. Jail. I, Gilbert Franklin Beck. am 36 years of age and my address is Main St. In Bear Dipsy Dip Boaz, Ala. I have been duly warned by Don Longshore & Arnold Hatley, who has identified himself as Etowah Co. Investigator that I do not have to make any statement at all, and that any statement I make may be used in evidence *990 against me on the trial for the offense concerning which this statement is herein made. Without promise of hope or reward, without fear or threat of physical harm, I freely volunteer the following statement to the aforesaid person:
"On Nov. 8, 1976, me and Mary Ann Thrasher the woman that I have been living with, left our house trailer at the above address & went over to Mary Ann's daughter's home at 259 Mt. Vernon Apts. Boaz, Alabama, the time was approximately 11:00 A.M. to 11:30 A.M.
"We stayed there at their apartment until about 1:00 P.M. eating Cookies & drinking milk & talking about robbing Mr. Malone & Aunt Mae, me & Deborah didn't want to commit the robbery but Mary Ann & Roy kept talking about all the money we could get. Me & Roy then got in my pick up truck & drove down to Mr. Malones, after we got down there we stood around & talked for a few minutes when a yellow Chevrolet drove up with three men in it, so we only stayed a few more minutes & went back to Roy Clements apartment in Boaz, we had planned on pulling the Robbery the first trip but this car drove up & we decided to leave.
"After we got back to Roy's apartment after the first trip, we stayed until about 2:00 P.M. to 2:30 P.M. & decided to go back down to Mr. Malone's. We got down there the second time & as we drove up in the driveway Mr. Malone came to the door & asked us to come inside, we stayed in the house & talked for a few minutes & Roy had gone to the bathroom, as he was coming back from the bathroom I grabbed Mr. Malone & he went down on his knees & hollered for Aunt Mae to get the gun. Roy then grabbed Aunt Mae & hit her in the head with a Rachet wrench that he taken out of my truck, at least four times. I did not do any of the cutting but I did hold Mr. Malone down. After Roy knocked Aunt Mae down he then drug her into the living room & then came to where I was holding Mr. Malone down, if there was anyone cut it had to be Roy that did the cutting. Roy then grabbed the billfold & purse & we ran for the truck, I was the one that was doing the driving, we first drove back to Roy's apartment & Mary Ann & Deborah were not there, so we decided to go to my trailer. We had only been at the trailer a few minutes when Mary Ann & Deborah came in. I was sitting at the kitchen table with the purse & billfold & the money spread out in front of me & Roy had sit down in the living room. There was $73.00 in currency, three $20.00 bills, one ten dollar bill & three $1.00 dollar bills, Roy got two $20.00 dollar bills & gave them to Deborah & I gave Mary Ann $33.00 dollars.
"I then got the shirt & a pair of bluejeans that I had been wearing, got some gas out of the back of the truck & put the clothes in a barrel there close to the trailer, poured gas on them & set them on fire.
"I then went back in the trailer & Mary Ann got some paper sacks out from under the kitchen sink & they put the purse & billfold in the sacks. We then got in Roy's car & drove towards Attalla on highway # 431, we got to the foot of the mountain, turned around & started back up the mountain & had got about two thirds of the way back up the mountain when Mary Ann suggested that we throw the purse & billfold over the side of the mountain. Roy then pulled over to the side of the road & I got out, I took the billfold out of the purse & threw it, I then threw the purse sack & all over the mountain at the same place I then got back in the car, Roy was driving & we then drove back by Mr. Malone's, when we got there I knew that they had been found.
"We then drove on back to the trailer, Roy & Deborah stayed a few minutes & then went home.
"I have read the 4 pages of this statement and the facts contained therein are true and correct.
*991
"Witness: Don Longshore Gilbert F. Beck
 "Signed by the arrested Party.
"Witness: Arnold Hatley Page 4 of 4 pages."
Investigator Leslie Cox, with the Etowah County Sheriff's Department, found a billfold which he identified as State's Exhibit No. 6, on Highway 431 North, better known as the "Boaz highway." He said the billfold was found "off the bluff almost to the top of the mountain up there the top about forty or fifty feet down the bluff." Cox stated that he brought the billfold to the office and gave it to Don Longshore.
Marlon C. Bartlett testified that he knew the deceased, Roy Malone, and knew that he was a retired veterinarian. Malone lived about a mile from Bartlett's father's house. Bartlett recalled that on November 8, 1976, he had gone to see his father and about ten minutes until three he stopped by "Doc Malone's house." Bartlett stated that he saw a pickup truck sitting in the yard and recognized it as being Beck's truck and stated that he saw the truck again on that date when he went to the appellant's residence with some officers from Etowah County.
Roy McDowell was the chief investigator for the Etowah County Sheriff's Department. He testified that he received from Donald Longshore, a man's billfold and a pair of boots which, he identified as State's Exhibits 6 and 9, and stated that he turned these items over to the State Toxicologist.
Roy Cooper knew the victim, Mr. Roy Malone, and stated that it was his understanding that Malone was a retired veterinarian. He recalled that on November 8, 1976, he was in Gadsden, Alabama, with Stewart Rogers and Homer Slaton. On that date, he and the two men went to see Malone relative to selling him some syrup. He said it was about 2:30 P.M. when they arrived at the Malone house and, as they drove up, Cooper saw two men talking to Malone. He identified the appellant as one of the men but indicated that he had not heard what was being said. According to Cooper, the men left "when I first got there." Cooper described the blue pickup truck that was sitting near the Malone house. He remained at the Malone residence about thirty minutes then left and went home.
During cross-examination, Cooper was asked if he could identify the other man that was with the appellant at the time. At that time, an individual, Danny Reeves, was brought into the courtroom and was identified as being the other person with Gilbert Beck at the Malone house. Cooper also identified a photograph of Roy Clements as depicting the other person at the Malone residence on that occasion. He added that, in his best judgment, the two pictures that he identified, one of the appellant and the other of Roy Frank Clements, were of the two men talking to Mr. Malone on that occasion.
Mary Ann Thrasher testified that she had known the appellant, Gilbert Franklin Beck, for about two years and that prior to November 8, 1976, she had been living with him. She stated that on that date, they were living in a house trailer behind the Dixie Dip, in Boaz, Alabama.
According to Thrasher, around noon on that day, she and the appellant went to see her daughter, Deborah Clements, and her husband Roy Clements. While there, the appellant said that he was going over to this "old man's house" and "we're going over there to get some money." Thrasher recalled at the time Beck made that statement, he was sitting down sharpening a knife "on a whet rock." She indicated the length of the knife and described it as being "a pocket knife and I believe it was a Case."
Thrasher said when the appellant finished sharpening his knife he and her son-in-law, Roy Clements, left in the appellant's pickup truck. They were gone for about an hour and when they returned to the apartment they said, "there were three men drove up *992 over there in a yellow car." Thrasher testified that the appellant and her son-in-law remained at the apartment about two and one-half hours and then "they went back."
According to Thrasher, she and her daughter remained at the apartment about two and one-half hours then left and went to a store. She stated they left the store and went to the house trailer that she and the appellant had occupied. On their arrival she saw the appellant and Clements. Sitting on the table in the trailer were a long billfold and a brown purse. She related that there was about eighty dollars in the billfold and that the appellant said there was about three hundred dollars in checks in it also. Thrasher added that the appellant gave her two twenty-dollar bills and gave her daughter, Debbie, the rest and placed the checks in the purse.
Beck told her to get him a pair of bluejeans and at that point changed clothes. The appellant then took the clothing that he was wearing outside of the trailer, placed it in a barrel and then set it on fire after pouring gasoline on it.
Thrasher recalled that before Beck changed his clothing he was wearing a pair of bluejeans, white tee-shirt, a green army jacket and a pair of black boots. Further, she said that she had seen blood on the clothing.
She also said that the appellant had stated that they had been at "that old man's house."
According to Thrasher, after the appellant changed his clothing, he placed the purse and the billfold in a paper sack. They then got in her daughter's car and drove down to the foot of the mountain. About half-way down the mountain they turned around, went back up, got out, and threw the sack, containing the purse and the billfold, over the side of a cliff.
Afterwards, she said they drove by the old man's house and there were lots of cars there. At that point, Thrasher said that her daughter started screaming and that she started crying. They returned to their house trailer and her daughter and son-in-law left and went home. She said that she and the appellant had been at the trailer for about twenty minutes when the investigators arrived. They arrested Beck and she and Beck were taken to the Etowah County Courthouse. Further, she said that the officers had taken the boots that Beck had been wearing. She identified the boots during the trial.
On cross-examination, Thrasher admitted she had a conversation with the appellant's sister, Elizabeth Lane, at the courthouse on the day of the trial. She said that she told the appellant's sister, "I told her I didn't believe he did it by himself." She denied saying that she knew that Gilbert Beck did not kill Mr. Roy Malone.
Upon further cross-examination, she denied making the statement in the presence of appellant's brother, Billy Beck, that, "if Gilbert Beck says that I helped plan this thing that I'm going to put a few lies on him." Further, she denied ever mentioning to Gilbert Beck that the victim, Mr. Roy Malone, had any money.
Thrasher also stated that she had seen blood on the boots and during the trial she pointed out the location on the boots where she had seen the blood. Further, she said that she did not know in which pocket the appellant carried the "whet rock" but that she had seen it in one of his bluejean pockets. Thrasher revealed that it was her aunt that was living in the house with the victim, Mr. Malone.
Deborah Ann Clements testified that she was Mary Ann Thrasher's daughter and that she was married to Roy Frank Clements. She said that she had known Gilbert Beck, the appellant, about two years, having first met him in Florida.
According to Clements, on November 8, 1976, her mother and the appellant, Beck, came to her house between 11:00 A.M. and lunch time. She recalled overhearing someone say the word, "rob." She remembered that her husband and the appellant, Gilbert Beck, left about lunch time and returned around 2:00 P.M. Around 2:30 P.M., they left a second time and she next saw the two at the trailer where her mother and the appellant lived.
*993 Clements testified that as they walked into the trailer she noticed a lady's purse and a man's billfold on the table. She said that as she walked over to the table, the appellant mentioned the words, "we did it." She then looked into the brown purse and saw a brown envelope bearing the name, "Dora Mae Ford." She testified that she saw the appellant with some money and that he gave her mother half of it and her husband the other half.
Clements also recalled that she saw the appellant take a green shirt that was lying on the couch and throw it in a barrel which was emitting smoke. The four of them left in her husband's car and drove down the mountain where the appellant got out and threw the sack containing the purse and the billfold, down the mountain.
According to Clements, they left the mountain and drove to the Shady Grove community. When they neared the Malone house they saw police cars parked in the yard. It was then that she and her mother started crying. After leaving the vicinity of the Malone house they returned to her mother's trailer where they remained for a few minutes; then she, her husband, and their little girl went home.
During cross-examination, Clements testified that she did not see the appellant, Beck, sharpen a knife. Clements also said that she did not hear anyone say that they were going to rob the old man. She denied riding in the car with her mother to the Shady Grove community when her husband and the appellant, Beck, left the second time. On further cross-examination, she said that she had seen the name, "Dora Mae Ford," on a check in the lady's purse. She testified that Dora Mae Ford was her great-aunt, and she admitted that she had "guessed" there had been a robbery. She said that she saw blood on the appellant's pants and shoes.
Clements recalled that, when they returned to their apartment from her mother's trailer, some men came after her husband and took him to the courthouse. She stated that later that night she saw her husband at the county courthouse. It was while she was there that she gave a statement to the authorities. Afterwards, she said, when her mother had completed giving her statement, she and her mother left and went home.
Bill Bragg, the coroner for Etowah County, testified that he first observed the body of the victim, Mr. Malone, at his residence. He stated that he was dead at the time and that it was his opinion that the cause of death was massive hemorrhage due to what he described as a "gaping wound to the neck." He said that it was undoubtedly inflicted by some type of knife. Further, he said the wound, which was deep enough to sever the main arteries in the neck, went from the ear past the middle sector of the neck.
Bragg stated that the body was removed by Carr Funeral Home and that he saw it again the next morning at the funeral home. Further, he testified that he had instructed the funeral home not to "do anything to the body" until it was transported to Auburn. Bragg indicated that the body was transported to Auburn where it was turned over to Mr. Van Pruett.
During cross-examination, Bragg said that it was his opinion that the wound was on the left side of the victim's neck.
Eddie Lloyd Cox was called by the State and testified that on November 8, 1976, he was working with the Etowah County Sheriff's Department. He stated that on that date, he went to the victim's home about 5:28 P.M., and made photographs depicting the body of the victim. He identified State's Exhibits 1, 2 and 3, as those pictures he had made of the victim on that occasion.
Van Pruett, Jr., was a State Toxicologist on November 8, 1976, and he testified that on November 9, 1976, he saw the body of the victim, Mr. Roy Malone, at the morgue at Auburn, Alabama. He stated that the body had been delivered by Mr. Ralph Phillips, a medical examiner field agent, affiliated with "our department and the Etowah Coroner, Bill Bragg."
Pruett testified that his examination of the body revealed, "an incised wound measuring *994 five and one half inches in its length circling the right side of the neck commencing under and slightly back of the corner of the mandible, which is the corner of the jaw, and extending forward to the midline of the neck." He said this "incised wound ranged through the lateral musculature of the neck, the major muscles on the neck and the jugular vein was severed." Pruett stated that it was his opinion that death was caused by "massive hemorrhage from the severing of the left jugular vein and the left branch of the common carotid artery."
Pruett removed two vials of blood from the body of Malone, labeled, sealed and prepared them for transmittal to the Jacksonville laboratory. Pruett said the vials were then turned over to Mr. Ralph Phillips.
During cross-examination, Pruett stated that the body he examined at the morgue was identified to him by Bragg and Phillips as being the body of Malone. Further, he said that the wounds he observed on the body of Malone were sustained while the person was alive. On further questioning, Pruett said he could not say whether or not the person who had inflicted this wound on the victim was standing in front of the victim or behind him.
Ralph Phillips testified that he was employed by the State Department of Toxicology as a medical examiner field agent. He stated that he assisted the coroners and he carried bodies to Auburn in the event an autopsy was needed. Phillips said that on November 9, 1976, around 8:00 P.M. he went to the Carr Funeral Home and picked up a body. The body was identified to him as being that of Malone and he carried it to the morgue in Auburn where it was turned over to Mr. Pruett.
Phillips said that, after the autopsy was finished, Mr. Pruett returned the clothing that had been on the body and also gave him two vials identified as containing blood from the body. Phillips stated he carried the vials to the Jacksonville laboratory and turned them over to Mr. John Case.
John M. Case, employed by the Alabama Department of Toxicology and Criminal Investigation in Jacksonville, Alabama, testified that on November 10, 1976, Investigator Roy McDowell turned a billfold over to him. He said he examined the billfold and found several stains which he identified as human blood. During the trial he identified State's Exhibit No. 6 as that billfold.
Case also stated that on November 10, 1976, he received two vials of blood from Ralph Phillips and that the blood was identified as that of Roy Malone. Case said the blood was examined and found to be "Group O, human blood." Further, he said he could not say that the blood found on the billfold was "Group O," but could only say that the analysis showed that it was, in fact, human blood.
Case said that, while he was at the sheriff's office in Etowah County, McDowell turned over to him a pair of boots. He stated that he examined the boots for blood stains and found some stains on the left boot near the toe. He said several of these stains were examined and found to react characteristically as "Group O blood."
During cross-examination, Case acknowledged that the majority of people have "O Type Blood."
Case said that there were at least six spots on the boots and were an eighth of an inch to a quarter of an inch each.
Case was not asked to develop any fingerprints on the boots or lady's purse, nor was he asked to examine the purse. On further examination, he admitted that the sheriff's department of Etowah County, turned over to him certain clothes belonging to Roy Clements. He stated that he had examined the clothing and found traces of human blood, "Type O."
At the end of the State's presentation of evidence the defendant called Vernon Sash as a character witness to testify to the appellant's good general reputation. In addition to Mr. Sash, the appellant called his sister, Mrs. Elizabeth Lane. She testified that Mary Ann Thrasher, during the course of the trial, but outside the courtroom, made statements implicating herself and expressing her belief that Gilbert Beck did *995 not kill Roy Malone. Further, Mrs. Lane, in her testimony, indicated that Mary Ann Thrasher had great influence over her brother, the appellant.
William T. Beck, appellant's brother, said that during the trial he overheard Mary Ann Thrasher, while outside the courtroom, remark that she "planned to do some lying," when she was called to testify, because she felt she was being implicated in the case.
Gilbert Beck took the stand in his own behalf and testified that he came to Alabama in June of 1976, for the first time in his life, and returned to Alabama around September, 1976, at the insistence of Mary Ann Thrasher. Beck said that Thrasher continuously talked about large sums of money located at the home of Roy Malone.
According to Beck, on November 8, 1976, he and Roy Clements traveled to the home of Malone on two occasions. He stated that he and Clements planned to go to the home, tie up Malone and take the large sum of money that Mary Ann Thrasher had insisted was kept in the house.
Beck testified that during the course of the struggle with Malone, while he was attempting to tie him, Clements approached and attacked Malone with a knife. Beck said that, after Clements attacked Malone, he immediately left the Malone house and went to the truck and waited for Clements. He recalled that Clements joined him shortly and was carrying a woman's purse and a man's billfold.
Beck said that the money found in the billfold and the purse was divided and the purse and billfold were later thrown over a high bluff located in the area.
Beck insisted that he did not harm Roy Malone or remove anything from the house.
During cross-examination, Beck identified a letter that he had written to Mary Ann Thrasher while he was in the Etowah County Jail, which stated in essence that she was in no way implicated in Malone's death and that, if he (Beck) said that she was, he would be lying.
Beck testified that the victim, Malone, was approximately six feet tall and weighed around two-hundred pounds. According to Beck, after he grabbed Malone, and the victim went down to his knees, Malone hollered for "Aunt Mae to get the gun."
According to Beck, Malone was on his hands and knees at the time Clements cut his throat. Beck said that he was holding Malone around the waist when Clements cut him. Beck stated that, although he had been a carpenter, he did not have a knife on that occasion.
Beck denied making any plans to rob Mr. Malone but stated that Clements and Mary Ann Thrasher "always talked about planning a robbery." He admitted that they had planned to rob Malone on that first trip to his house, but added that he did not intend to hurt, harm or kill anyone. He also admitted that there was an agreement among Clements, Thrasher, and himself to rob Mr. Malone and that the money was to be split "fifty-fifty."
During further questioning, he said that they had remained in the Malone house for some forty-five minutes but added that he did not go in any part of the house other than the kitchen.
He admitted burning the pair of bluejeans and the green shirt that he had had on, stating that each piece of clothing had a drop of blood on it.
At the end of appellant's testimony, the defendant called the circuit clerk of Etowah County who testified that Roy Frank Clements was indicted and charged with the robbery and murder of Roy Malone.
Thomas Earl James who next called and testified that Mary Ann Thrasher was his first cousin and that her general reputation in the community for truth and veracity was bad. At the end of James' testimony, the defendant rested its case, and after recalling the victim's son, Ted Malone, the State also rested.
Upon this evidence the jury determined the defendant to be guilty as charged and fixed his punishment at death.
*996 After receiving the jury's verdict, the court set July 20th as the date for the aggravating and mitigating circumstances.
On July 29, 1977, the court in accordance with Alabama's new death penalty act; Act No. 213, Acts of Alabama 1975, § 2(b); § 13-11-2, Code of Alabama 1975; T. 15, § 342(4), Code of Alabama 1940, Recompiled 1958, 1975 Interim Supplement, conducted the sentencing phase of the bifurcated capital sentencing scheme.
During the hearing, the appellant was present, being represented by each of his trial counselors and the State was represented by the district attorney of the county circuit.
The only testimony presented by the State came from the Etowah County Sheriff. During his testimony, the sheriff stated that it was his opinion that the offense with which the appellant was charged "was one of the worst cases that I have ever helped investigate."
During cross-examination, the sheriff stated that the appellant did not have a "record."
At the completion of the sheriff's testimony the State ended its presentation of evidence at the sentencing hearing. The court, at that time, took judicial notice of the testimony that came out during the trial and stated that it would consider an investigation report by the Department of Probation and Parole, along with a written report dated February 23,1977, prepared by Dr. J. Stephen Ziegler, a Ph.D. in clinical psychology.
At that point, the appellant was called in his own behalf and his testimony was primarily the same as it was during the trial, where he stated that he did not intend to kill anyone or take anything from anyone and that Mary Ann Thrasher had unduly influenced his actions. In addition to the appellant's testimony the two officers were called in his behalf, and were questioned on matters that were not of a mitigating nature.
Also called by the appellant at this proceeding, was his sister, Elizabeth Lane, and his father, J. L. Beck. Each gave testimony concerning the extent of Mary Ann Thrasher's influence over the appellant and further testified that the appellant had never been involved in any other criminal offense.
At the end of the foregoing testimony, the court heard arguments from the State and appellant's counsel.
It was at that time that the court made the following findings before sentencing the appellant to death:

. . . . .
"The Court: Let the record show that the Court does not consider that. Onlythe Court today is only considering aggravating and mitigating circumstances as to the guilt or innocence as has already been determined by the jury.
"Gentlemen, after hearing the trial of the case, hearing the evidence presented on this hearing of aggravating and mitigating circumstances and the arguments of attorneys, and all being duly considered, the Court finds that in aggravating circumstances: That a capital felony was committed while the Defendant was engaged or was an accomplice in the commission of robbery. That the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, in the fact that the only two people at the house at the time the offense was committed were murdered. That the capital felony was committed for pecuniary gain. The capital felony was especially heinous, atrocious or cruel as under 342(4)(j) where murder in the first degree where-in [sic] two or more human beings are intentionally killed by the Defendant by one or a series of acts.
"As for the mitigating circumstances of the Defendant, I find that the Defendant has no significant history of prior criminal activities. That is the Court's findings.

. . . . .
"The Court: Gilbert Franklin Beck, it is the sentence of the Court, and I pronounce it upon you, that you be put to death. . . .

. . . . .

*997 "Since this is an automatic appeal let the record show that the sentence is ordered suspended pending the outcome of the decision of the appellate court'sfinal determination by the appellate courts."

I
Appellant contends it was error to dismiss the motion to quash the indictment filed against him. It is strenuously argued that the indictment was fatally defective because all the grand jurors who were summoned were not afforded the opportunity to hear the evidence presented to them in the grand jury room. Appellant maintains that all should have had the opportunity to join in the deliberations with their fellow-jurors. Counsel insists that the opportunity to deliberate and vote cannot be abrogated.
A hearing on the motion to quash was held and the testimony elicited at that time established the following facts:
On November 24, 1976, a special grand jury was convened before Circuit Judge Cunningham. According to one witness, who had been a member of that grand jury, one of the grand jurors was late and arrived after the evidence had been presented.
James Craig Reynolds testified that he had been summoned to serve on the grand jury and that the subpoena directed him to be present at 10:00 A.M., on November 24, 1976. When he arrived he was taken into the district attorney's office and shown the evidence that had been presented to the other jurors. According to Reynolds, he reviewed the evidence outside the grand jury room with another member of the grand jury, Joy Taylor.
Reynolds said that no vote had been taken by the grand jury before he arrived. He stated that after his arrival they considered no evidence other than that which he had already seen. Reynolds testified that to the best of his knowledge the rest of the grand jury members were present.
Mary Wiggins Raley, another member of the special grand jury recalled that when she arrived at 9:00 A.M. on November 24, 1976, fifteen members of the grand jury were present. Further, she stated "two came in a little late and heard the evidence and then one came in too late to hear it."
Raley testified that none of the late arrivals voted in the proceedings. From the record we read:

. . . . .
"Q. Did the one that come [sic] in too late to hear it, did he vote also?
"A. Oh, no. We had already gone back in.
"Q. Well, let me ask you. Did the two that come [sic] in a little late, did they cast a vote?
"A. No.
"Q. Do you know whether or not they did?
"A. Yes, I know. They were out of the room reading the evidence that we had presented to us and while they were out we counted the number of people there and said well, let's see if we can make a vote, and we voted before they come [sic] back in.
"Q. Did you count Mr. Rayburn in that fifteen?
"A. He wasn't in there.

. . . . .
"Q. These people who went out in the hall and looked at some stuff, did they ever have any discussion about whether to indict Mr. Beck or not or have any imput into it at all?
"A. I don't suppose they did. The voting was done before they came back in.

. . . . .
"THE COURT: I have a question. Mrs. Raley, you said the voting was done before those two others that came in late came in?
"A. While they were in the other room reading the evidence the foreman of the jury looked around and said `well, there is [sic] fifteen of us here. Let's see if we can get twelve to vote for a true bill.' And we got a unanimous vote.
"THE COURT: So those people who were late did not participate?
*998 "A. No."
Further, Raley stated that when the latecomers came back in, the foreman informed them that they had voted for a true bill and asked if they would like to vote against it, and if so, another vote would be taken. At that point they stated they were in agreement with what the other members of the grand jury had done.
At common law, a grand jury was composed of not less than twelve nor more than twenty-three duly qualified men. It was their duty to inquire into charges of crime or misdemeanor and decide from the evidence whether prima facie ground for criminal accusation existed. State v. Bramlett, 166 S.C. 323, 164 S.E. 873; State v. Barker, 107 N.C. 913, 12 S.E. 115.
In most jurisdictions, however, the number of grand jurors is fixed by statute or constitutional provision. In this State, the grand jury consists of eighteen. T. 30, § 38, Code of Alabama 1940, Recompiled 1958; § 12-16-74, 1975 Code of Alabama.
The only other provisions in relating to the number of grand jurors appear in T. 30, §§ 41, 89 and 93, Code of Alabama 1940, Recompiled 1958; §§ 12-16-76, XX-XX-XXX and XX-XX-XXX, Code of Alabama 1975.
Section 41 provides that if in the event the grand jury, for any reason, is reduced "below the number required by law, the court shall, in the manner prescribed in this article, supply all deficiencies."
In Hafley v. State, 8 Ala.App. 378, 62 So. 319 (1913), it was held that this statute does not require that the number (18) of the jury as organized must be maintained to constitute a legal grand jury. There it held that a lesser number would suffice so long as it was at least the minimum set by law. The court said the number below which a grand jury cannot be reduced is not fixed by the jury law passed in 1909, but by § 7283 of the Code, which authorized deficiencies to be supplied only when the number was reduced below fifteen. Hafley v. State, supra; Patterson v. State, 171 Ala. 2, 54 So. 696. See Moore v. State, 9 Ala.App. 672, 62 So. 320.
Section 7283 was deleted from the 1923 Code of Alabama and has not reappeared in any subsequent Codes, including the 1958 recompilation of the 1940 Code of Alabama.
Section 89 of T. 30 provides that the "concurrence of at least 12 grand jurors is necessary to find an indictment." Section 12-16-204, Code of Alabama 1975.
Section 93 of T. 30, mandates that should the number of grand jurors be reduced below thirteen because of the operation of § 92 of T. 30, the court shall supply the deficiency. Section 92 requires withdrawal of a grand juror if that juror has some interest in the investigation due to his being charged with the offense under investigation; or if he has been the victim of an offense under investigation; or if he is a prosecutor; or is related by blood or marriage to the person charged. In the event that such a deficiency exists, the court must supply enough grand jurors to fill a box with thirteen or more.
Under the Constitution of the United States, no requirement exists that a grand jury shall be organized with the same number of jurors as at common law. Talton v. Mayes, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196.
In State v. Miller, 3 Ala. 343, the court held that it was essential to the validity of an indictment that twelve grand jurors concur in the finding of a true bill. This portion of the law has been codified in § 89, Code of Alabama 1940, Recompiled 1958, § 12-16-204, Code of Alabama 1975. See Smith v. State, 142 Ala. 14, 39 So. 329 (1904); Tate v. State, 26 Ala.App. 411, 161 So. 456 (1935).
Although there was a conflict in the testimony as to the number of grand jurors in attendance, it was not disputed that at least fifteen were present. Even under the 1907 Code there would have been a sufficient number present to constitute a legal grand jury.
Under our present Code, there is no doubt that the grand jury was duly empowered to return an indictment, although there may have been, at the most, three who did not *999 participate in the deliberation and vote. Even though eighteen grand jurors were summoned, our Code and case law only requires the concurrence of twelve to return a valid indictment. There was no error in denying the appellant's motion to quash.

II
The appellant next contends that the Alabama death penalty statute, Act No. 213, Acts of Alabama, 1975, Code of Alabama, 1975, §§ 13-11-1 through 13-11-9, does not comply with the constitutional demands of the Eighth and Fourteenth Amendments.
In support of this contention, the appellant has submitted several arguments which we have summarized in the following paragraphs and will discuss in the order of their appearance.
A. The trial or petit jury is not allowed to consider mitigating or aggravating circumstances in the case.
B. The grand jury alone, under the influence of the district attorney of a county, makes the determination of the existence of any aggravating circumstances, and it is from the district attorney that the grand jury hears evidence of aggravating circumstances.
The appellant insists that this is a one-sided presentation of evidence and the "chilling fact is that the local district attorney alone makes the decision to try a defendant under the new death penalty act." The appellant maintains that to deny him a right to testify, and to cross-examine witnesses of his own, is a denial of due process.
C. The trial jury cannot be instructed on lesser included offenses.
In the absence of such a provision, the appellant insists that the only choice that a petit jury has is imposing death or acquitting the defendant. He states that because only those two choices are presented to the jury, the statute can only be interpreted as having a mandatory death provision.
D. The conduct of the post trial hearing on aggravating and mitigating circumstances by the trial judge places upon him a tremendous burden in that the jury has imposed the death sentence in a widely publicized case.
It is argued that this places a burden on the trial judge that he cannot ignore.
Appellant insists that the Alabama death penalty statute is mandatory in that it fails to meet the test of allowing any discretion on the part of the jury before imposing sentence. The appellant cites Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, and states:
"A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not."
F. Appellant insists that, if, in fact, the jury's verdict is advisory only, the appellant's right to a trial by jury would still be abridged because the jury's function would be relegated to that of only a finder of fact with no part in the sentencing process.
As to contention "A", jury sentencing in capital cases has never been suggested by the Supreme Court of the United States as being constitutionally required. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; Jacobs v. State, Ala. Cr.App., 361 So.2d 607 (1977). In summary, what Jacobs quoted Proffitt as saying was that sentencing by a trial judge in capital punishment cases would lead to more uniformity and consistency because a judge was more experienced in sentencing than a jury. Further, he is better able to impose similar sentences to those imposed in prior analogous cases.
The Alabama death penalty statute, supra, provides for sentence of death involving murder with aggravation. With this guidance we cannot accept assertion "B" that district attorneys of this State will systematically fail to file capital murder charges, when the evidence warrants it, or seek convictions on inadequate evidence.
Someone must exercise this discretion and judgment as to what charges are to be filed and against whom. This is part of our criminal justice system and is essential *1000 to its operation and enforcement. The discretion reposing in Alabama's district attorneys is no more than that invested in other prosecutors across this country. It furnishes no basis for inferring that capital crimes will be prosecuted on an arbitrary and capricious basis. Also, that capital murders will be prosecuted so frequently and arbitrarily that our death penalty statute would be void under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, is an invalid assumption.
Denying this appellant access to the grand jury proceedings in the disallowing of the presentation of defense witnesses, along with the cross-examination of the State witnesses, is not an abridgment of his due process right. Costello v. U. S., 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397.
Contention "C", that Alabama's new death penalty act involves a mandatory death provision was treated specifically in Jacobs v. State, supra. There, Judge Harris writing for a unanimous court, stated:
"The jury's function is only to find guilt or innocence. The jury is not the sentencing authority. . . . the verdict of the jury is advisory only as the law compels the trial judge to hold a separate hearing to consider aggravating and mitigating circumstances . . ."
Appellant's argument "D" is also unacceptable. The Alabama capital sentencing procedure is determined by the trial judge, which is discussed in the preceding paragraph. Nonetheless, this sentencing phase of Alabama's bifurcated capital murder trial method seeks to assure that the death penalty will not be imposed in an arbitrary and capricious manner. This has also been minimized by Alabama's appellate review system under which the evidence of aggravating and mitigating circumstances is reviewed and re-weighed, not only by the court of Criminal Appeals of Alabama, but by the Supreme Court of Alabama. The Supreme Court of Alabama has never displayed any reluctance or temerity in reversing a death sentence. Their history has shown that some twenty-five death cases have been reversed for various reasons. See Jacobs v. State, supra.
Under the new Alabama death penalty statute, the defendant has a second chance for life with the trial judge, a third with Court of Criminal Appeals, and a fourth with the Supreme Court of Alabama. Not only are the decisions of the trial judge in death cases reviewed to insure a fair and impartial trial, but they will insure consistency and uniformity of sentencing.
The capital sentencing scheme enacted by the Alabama legislature has set down a detailed guide to assist trial judges in deciding whether to impose the death sentence or imprisonment for life without parole. This reduces any risk that a sentence of death will be imposed in an arbitrary and capricious manner. Jacobs v. State, supra.
Further, in contention "E", the appellant has argued that the Alabama statute is mandatory in that it fails to meet the test of allowing any discretion on the part of the jury before sentence is imposed. The appellant has cited Jurek v. Texas, supra, for support. Under the sentencing system established by Alabama's new death penalty law, not only are aggravating circumstances considered, but mitigating circumstances are also taken into consideration by the trial judge. This provides "individualized sentencing determination."
Alabama's new death penalty law specifically directs that once a jury has found a defendant guilty of one of the aggravated offenses listed and has fixed punishment at death, the court must hold a hearing before sentencing the defendant. Act No. 213, Acts 1975, § 3, now, § 13-11-3 of the 1975 Code of Alabama, provides:
". . . In the hearing, evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to any of the aggravating or mitigating circumstances enumerated in sections 13-11-6 and 13-11-7. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is *1001 accorded a fair opportunity to rebut any hearsay statements; provided further, that this section shall not be construed to authorize introduction of any evidence secured in violation of the Constitution of the United States or the state of Alabama. The state and the defendant, or his counsel, shall be permitted present argument for or against the sentence of death."
Under Alabama's death penalty law, the trial judge is directed to consider "the particularized mitigating factors" set out in the act. However, along with this safeguard, the Alabama death penalty act goes one step further and provides the trial judge with the discretion of allowing "any such evidence which the court deems to have probative value." In short, the sentencing authority of Alabama's bifurcated capital sentencing system is given adequate information and guidance in imposing the death sentence by a carefully drafted statute.
The capital sentencing system used in Alabama meets "Furman's constitutional concern."

"Furman held only that in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."

Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859.
It is contended in argument "F" that the constitutional guaranty of a trial by jury as afforded by the Constitution of the United States and the State of Alabama, has been abridged by the Alabama death penalty statute. Counsel argues that the appellant has not had a trial by jury because the sentencing phase is conducted by the trial judge. Counsel also maintains that the appellant's right to a trial by a jury has been violated in that the inquiry of the jury has been limited and it has not had the opportunity to examine all the law and facts in the case.
The plurality opinions in Gregg v. Georgia, supra; Proffitt v. Florida, supra, and Jurek v. Texas, supra, held that in any capital sentencing procedure there must be a provision under which the "sentencer could separately consider the character and record of the individual defendant, along with the particular circumstances of the offense, including any mitigating circumstances existing." The Alabama death penalty statute has made such provisions.
No where in any of the capital cases considered by the Supreme Court of the United States is there any indication that it was constitutionally impermissible for a trial judge to determine the sentence in a death case. On the contrary, in Proffitt v. Florida, supra, the court specifically spoke to this point and approved judicial sentencing.
In Gregg v. Georgia, supra, the Supreme Court stated that the constitutional concerns expressed in Furman, supra, that a penalty of death might be imposed in an arbitrary or capricious manner, could be alleviated when a death statute directs the sentencing authority with adequate information and guidance. Although the Supreme Court in Gregg v. Georgia, supra, stated these concerns might be best supplied by a system that provides for a bifurcated proceeding, the court went on to say that this was not the only procedure permissible under Furman, supra.
Under the Alabama death penalty statute, the question of sentence is not considered until the determination of guilt has been made. At that time the trial judge becomes the sentencing authority and uses his experience as a trial judge in applying the mandates of the capital murder statute in assessing and determining the aggravating and mitigating circumstances of the offense. An experienced trial judge is in a better position to face the difficult task of imposing a death sentence because he daily faces the problem of assessing information concerning a defendant who is charged with a crime. He is accustomed to using sentencing information provided by the probation officers in our pardon and parole system.
*1002 In none of the cases involving death sentences that the Supreme Court of the United States has considered, does it state that the sentencing authority must be in the hands of a jury. The decisions in Gregg v. Georgia, supra; Proffitt v. Florida, supra, and Jurek v. Texas, supra, merely state that a bifurcated proceeding is the best method for meeting the constitutional concerns of Furman, supra.
In Proffitt v. Florida, supra, the Supreme Court stated:
"The requirements of Furman are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition."
The directions given the Alabama trial judge as the sentencing authority are more than adequate to enable him to weigh the aggravating circumstances against the mitigating ones. Thus, the trial court's sentencing discretion is "guided and channeled" by a system that focuses on the circumstances of each individual, and the circumstances of the offense itself in deciding whether the death penalty is to be imposed.
Once a sentence is imposed, the sentencing judge must set forth in writing the statutory reasons that led him to his decision. These reasons, along with the entire record and transcript, are reviewed, not only by the Court of Criminal Appeals of Alabama, but the Supreme Court of Alabama as well.
In view of the foregoing authority, it is our judgment that the appellant's right to a trial by a jury has not been abridged under Alabama capital sentencing procedure.

III
It is insisted that the sentencing procedure conducted by the court after the jury's determination of guilt violated due process in that the appellant was required to prove mitigating circumstances.
The appellant relies on Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393, for support of his contention. However, Gardner v. Florida, supra, can be distinguished. There, the Supreme Court in vacating a death sentence, stated that a defendant facing such a sentence, who was not informed of the contents of a pre-sentence investigation report made to the sentencing judge, was denied his due process rights. The Supreme Court's condemnation arose, not from the fact that the appellant had the duty to prove mitigating circumstances in order to counteract the existence of aggravating circumstances, but due to the fact of nondisclosure of the pre-sentencing investigation report.
The essence of due process is the opportunity to be heard:
"Due process of law implies the right of the person affected thereby to be present before the tribunal which pronounces judgment upon the question of life, liberty, or property, in its most comprehensive sense; to be heard, by testimony or otherwise, and to have the right of controverting, by proof, every material fact which bears on the question of right in the matter involved. If any question of fact or liability be conclusively presumed against him this is not due process of law." Zeigler v. South & North Ala. R.R. Company, 58 Ala. 594.
Due process requires that a defendant enjoy a full opportunity to insure the factual accuracy of the information used to determine his sentence, by extending to him those same traditional means used to resolve factual issues. The right to be heard protects the appellant against an erroneous deprivation of life by giving him a chance to sharpen the issues and expose the inconsistencies and bias, so that the fact-finding process will be reliable. Under Alabama's new death penalty statute, the appellant is given an opportunity to be heard and is accorded a fair opportunity to rebut any evidence.
The fact in issue to be determined by the trial judge is whether the appellant will suffer death.
*1003 In an abundance of caution, the Alabama death penalty statute mandates a full evidentiary hearing with the formal submission of evidence subject to the restriction only of disallowing evidence in violation of the Constitution of the United States and the State of Alabama. Evidence submitted at the sentencing hearing is not governed by the exclusionary rules of evidence.
Once the appellant is afforded the rights to present witnesses, documentary evidence, and to confront and cross-examine witnesses, the due process requirements of the Constitutions have been met. He may, or may not, avail himself of that opportunity, but due process requires that he be afforded that opportunity.
In the present case, the new Alabama death penalty statute more than adequately meets due process requirements.

IV
The appellant insists that the trial court erred when, during its oral charge to the jury it gave the following instruction:
"If he is acquitted in the case, he can never be tried for anything he did to Roy Malone."
In our search and examination of the record, we find nothing to indicate that an exception was taken to this portion of the court's oral charge and, in the absence of such an exception, the error is not preserved.
This specific point was discussed by Presiding Judge Harris in Jacobs v. State, supra, where he stated:
"It has been firmly established by both this court and the Supreme Court of Alabama, that in the absence of an exception to the court's oral charge, nothing is presented for review on appeal. The rule applies with equal force under our Automatic Appeal Statute in death cases. T. 15, § 382(1) et seq. Code of Alabama 1940, Recompiled 1958; Richardson v. State, 57 Ala.App. 24, 325 So.2d 540; Harris v. State, 56 Ala.App. 301, 321 So.2d 267; Cox v. State, 280 Ala. 318, 193 So.2d 759; Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (Death case); Knight v. State, 273 Ala. 480, 142 So.2d 899 (Death casereversed on other grounds)."
We note that the Alabama death penalty statute, Act No. 213, Acts 1975, § 2, now, § 13-11-2 of the 1975 Code of Alabama, states:
". . . [I]f the jury finds the defendant not guilty, the defendant must be discharged."
In our reading of the foregoing portion of the Alabama death penalty statute, we are convinced that the court's instruction was proper in view of the wording of the statute.
Nonetheless, in the absence of an exception, nothing is presented for review.

V
Finally, the appellant alleges that the Alabama death penalty statute is unconstitutional under the Alabama Constitution of 1901, specifically violating Article III, § 43, Article V, § 124, and Amendment 38, of the 1901 Constitution of Alabama.
Article III, § 43 reads:
"In the government of this state, except in the instances in this Constitution hereinafter. . . directed . . ., the legislative department shall never exercise the executive and judicial powers. . . the executive shall never exercise the legislative and judicial powers. . . the judicial shall never exercise the legislative and executive powers . . . to the end that it may be a government of laws and not of men."
Article V, § 124 reads:
"The governor shall have the power . . . to grant reprieves, paroles, commutations of sentence, and pardons . . . . The attorney-general, secretary of state, and state auditor shall constitute a board of pardons, who shall meet on the call of the governor, and before whom shall be laid all recommendations or petitions, for pardon, commutation, or parole, in cases of felony; and the board shall . . . *1004 give their opinion thereon in writing to the governor . . . (who) may grant or refuse the commutation, parole or pardon, as to him seems best . . ."
Amendment No. 38, to the above says that the governor has the power to grant reprieves and commutations to persons sentenced to die. The legislature has the power to control pardons and paroles and may authorize courts having criminal jurisdiction to suspend sentence and to order probation.
The amendment was intended to grant to the legislature the power to provide for pardons and paroles and also to regulate their administration. Summers v. State, 244 Ala. 672, 15 So.2d 502; Holman v. State, 43 Ala.App. 509, 193 So.2d 770.
Under the amendment only the governor has the power to commute a death sentence. Wilson v. State, 268 Ala. 86, 105 So.2d 66; Liddell v. State, 287 Ala. 299, 251 So.2d 601; Scott v. State, 247 Ala. 62, 22 So.2d 529.
Appellant cites Montgomery v. State, 231 Ala. 1, 163 So. 365, and avers that this decision was the impetus behind the enactment of Amendment 38. The validity of a statute conferring authority in the State courts with criminal jurisdiction the right to grant probation in certain situations was questioned. The Supreme Court ruled that this statute was violative of § 43 and of § 124. It was held that the legislature could not transfer to the judicial department those powers vested in the executive branch by the constitution and the statute was unconstitutional.
Because of Montgomery v. State, supra, a constitutional amendment was required to transfer the power of pardon and parole out of the executive branch. This was done through Amendment 38, however, Amendment 38 did not affect the exclusive power of the governor to commute one's sentence of death.
In view of the foregoing, the appellant adamantly insists that before the judicial branch can commute a sentence, a constitutional amendment is required just as Amendment 38 was required after the decision in Montgomery v. State, supra.
The threshold question is whether there is in truth, and in fact, commutation in the Alabama death penalty statute. This would certainly be true if the trial judge, during the sentencing hearing, has a right to commute a sentence of death. If this were true, then it would be in violation of the Alabama Constitution.
In our judgment, no such right exists under the statute in question.
Black's Law Dictionary, 351 (4th ed. 1951), defines commutation as:
"Alteration; change; substitution; the act of substituting one thing for another.
"CRIMINAL LAW
"The change of a punishment from a greater to less; of from hanging to imprisonment."
Further, the Alabama death penalty statute, Act No. 213, Acts 1975, §§ 3 and 4, T. 15, § 342(5), 342(6), 1975 Interim Supp., supra, now §§ 13-11-3, 13-11-4, of the 1975 Code of Alabama, specifically outlines the province of the jury during trial and the trial judge during the sentencing hearing. T. 15, § 342(5), 1975 Interim Supplement, supra, reads:
"If the jury finds the defendant guilty. . . and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole."
T. 15, § 342(6), 1975 Interim Supplement reads:
"Determination of sentence by court; court not bound by punishment fixed by jury.
"Notwithstanding the fixing of the punishment at death by the jury, the court, after weighing the aggravating and mitigating circumstances, may refuse to accept the death penalty as fixed by the jury and sentence the defendant to life imprisonment without parole . . . or the court, after weighing the aggravating and mitigating circumstances, and *1005 the fixing of the punishment at death by the jury, may accordingly sentence the defendant to death."
Additionally, in Jacobs v. State, supra, this court also delineated the authority of the jury at trial and the judge at the sentence hearing, specifying the duty of each at the individual phases of the bifurcated trial.
The United States Supreme Court in Proffitt v. Florida, supra, pointed out that the jury verdict was advisory only, and that the actual sentencing was to be determined by the trial judge. The court went on to state that the trial judge was the sentencing authority. See Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344.
In Jacobs v. State, supra, Judge Harris observed that the death penalty in Alabama was strikingly similar to the one upheld by the Supreme Court in Proffitt v. Florida, supra. Judge Harris commented:
"The Death Penalty Act in Alabama is strikingly similar to the one upheld by the Supreme Court in Proffitt v. Florida, supra. In Florida, the jury decides first the guilt or innocence of the defendant. Then, in a separate hearing, the jury determines the sentence after considering and weighing statutorily defined aggravating and mitigating circumstances. Under Florida's system the sentence can be death or life imprisonment. However, the verdict of the jury is only advisory as the actual sentence is determined by the trial judge."
This excerpt from Jacobs, supra, clearly indicates the jury's function is advisory and its duty is to adjudicate guilt, whereas it is the province of the trial judge to determine the actual sentence.
According to the definition of commutation we come to the next question, that being, when does commutation occur? It is evident that only after one has been sentenced can there be a commutation.
Under our death penalty statute, the question of sentence is not considered until the determination of guilt is made by the jury at the guilt phase of the bifurcated hearing. Once the jury finds the defendant guilty of one of the aggravated offenses, it fixes the punishment at death. However, it is the trial judge, who, at a separate hearing, determines whether or not the defendant is to suffer death or life imprisonment without parole. The verdict of the jury is advisory only. No sentence exists until the pronouncement by the trial judge at the conclusion of the sentence hearing. It is for this reason the court cannot be said to be commuting a sentence of death imposed by the jury, but, in truth and in fact, it is sentencing the accused after a jury's finding of guilt.
We note, however, that once this sentence has been imposed by the trial judge at the sentencing hearing, it can be commuted by the governor of this State afterwards, at any time, even up to the time of execution.
In view of the foregoing, we are of the opinion that Alabama's new death penalty statute is constitutionally sound under both the United States and the Alabama Constitutions.

VI
After carefully reviewing and analyzing the record, briefs, and oral arguments of the parties, we find that no reversible error has been shown.
We have also considered the mitigating and aggravating circumstances and have found that under the facts of this case, death was the appropriate penalty.
The facts in this case, after a careful evaluation, show a marked similarity with those in Jacobs v. State, supra.
It seems to us that the result is inescapable that the punishment, too, should be the same.
Accordingly, no reversible error appearing, the judgment of conviction, and sentence of death is hereby affirmed.
AFFIRMED.
HARRIS, P. J., and TYSON and BOWEN, JJ., concur.
BOOKOUT, J., concurs specially.
*1006 BOOKOUT, Judge, concurring specially:
Regardless of the mechanism for requiring the trial judge to consider aggravating and mitigating circumstances, there still seems to be a misinterpretation of certain of those circumstances by trial judges. This appears in two instances in this case:
(1) "That a capital felony was committed while the Defendant was engaged in. . . the commission of a robbery."
(2) "That the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. . . ."
It is difficult to see how robbery can be the aggravating circumstance of robbery. The appellant here was charged under § 2(b) of Act No. 213, Acts of Alabama 1975. The offense is robbery when the victim is intentionally killed by the defendant. The basic offense is robbery, and the aggravating circumstance elevating it to a capital felony is the murder of the victim. Thus under § 2(b), supra, robbery cannot be assigned as the aggravating circumstance to elevate robbery to a capital felony.
Likewise, as in my concurring opinion in Jacobs, supra, I do not believe that the killing of the victim was for the purpose of "avoiding or preventing a lawful arrest or effecting an escape from custody." To quote from that concurring opinion:
". . . That section speaks of avoiding or preventing a lawful arrest or effecting an escape from custody. That wording was added to the act to protect peace officers. It is to deter `shoot outs' with arresting officers, or in escapes after arrests. The words `lawful arrest' are significant in that a person in Alabama may resist, with force, an unlawful arrest. Green v. State, 238 Ala. 143,189 So. 763 (1939). When coupled with the phrase referring to escapes from custody, it is apparent that the legislature was attempting to protect officers of the law rather than potential identification witnesses. If protecting potential witnesses was the intent of that section, the legislature would merely have said that killing a potential witness would be an aggravating circumstance."
However poorly Act No. 213, supra, is written, and subject to misinterpretation in some areas, it nevertheless requires a finding of only one aggravating circumstance to uphold the death penalty pursuant to § 4(a). Here the trial judge properly found the aggravated robbery to have been (1) committed for pecuniary gain, and (2) was especially heinous, atrocious, or cruel. Finding that the record supports the trial court's finding of those latter two circumstances, I therefore concur in the instant opinion.